















KAJ    11/25/02    15:33

3:02-CV-01978    HANG V. ASHCROFT

*9*

*TRAV.*

ORIGINAL

1  JASON I. SER
   California Bar. No. 201816
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
   225 Broadway, Suite 900
3  San Diego, California 92101-5008
   (619) 234-8467
4
   Attorneys for Petitioner

FILED

NOV 2 2 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### (HON. NAPOLEON A. JONES, JR.)

| | |
|---|---|
| SOPHEA HANG,<br>[A27-747-367],<br><br>Petitioner,<br><br>v.<br><br>JOHN D. ASHCROFT, ATTORNEY GENERAL, UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, AND ADELE FASANO, INS DISTRICT DIRECTOR FOR THE SAN DIEGO DISTRICT,<br><br>Respondents. | Case No. 02-cv-1978-J (AJB) |

**PETITIONER'S TRAVERSE AND EXHIBITS**

Table of Authorities ................................................... iii

I.   INTRODUCTION ................................................ 1

II.  FACTUAL BACKGROUND ...................................... 1

    A.   Petitioner's Immigration Background ....................... 1

    B.   Establishment of the "Joint Commission" on Repatriation ...................... 2

    C.   Post-Memorandum Removal Efforts in Petitioner's Case Remain Unfruitful ......... 2

III. ARGUMENT ................................................... 5

    A.   The Supreme Court's Decision in <u>Zadvydas</u> Controls This Matter. ............... 5

    B.   No Deferral to the INS's Administrative Determination Is Permitted or Warranted. ..... 6

        1.   The Supreme Court in <u>Zadvydas</u> Held That the Habeas Court Must Conduct a Separate Analysis of an Alien's Removability and Should Not Defer to the Government's View about Whether the Implicit Statutory Limitation Is Satisfied in a Particular Case. ........................... 6

        2.   Furthermore, the August 3, 2002 Order by the HQPDU Does Not Constitute a Decision Pursuant to the July 19, 2001 Memorandum by the Attorney General or New Review Procedures Set Forth at 8 C.F.R. § 241.13 ............................................. 8

        3.   Petitioner's "Weighty Due Process Rights" in Conjunction with the <u>Zadvydas</u> Decision Militate Against a Deferral to Any Future Administrative Determination by the HQPDU, Which Is Currently Overdue in Violation of Procedural Requirements Set Forth at 8 C.F.R. § 241.13 ............................................. 9

        4.   Respondents Seek to Rely Upon Regulations that Violate Petitioner's Right to Substantive and Procedural Due Process ...................... 10

    C.   Petitioner's Removal from the United States Is Not Significantly Likely in the Reasonably Foreseeable Future Despite the Newly Signed Memorandum .......... 13

        1.   <u>Ma v. Reno</u> Contemplated the Existence of a Fully "Functioning" Agreement Regarding Repatriation in Determining Whether the Removal of an Alien Indefinitely Detained by the INS Is Significantly Likely in the Reasonably Foreseeable Future ....................................... 13

        2.   The Memorandum Establishing a "Joint Commission" Does Not Constitute a Fully "Functioning" Agreement Regarding Repatriation and, On Its Own, Does Not Support the Proposition That Petitioner's Removal to Cambodia Is Significantly Likely in the Reasonably Foreseeable Future. ........................................... 14

3. Statements by INS and Cambodian Officials Contradict the INS's Representations that Repatriation of Any and All Cambodian Nationals, Including Petitioner, Is Imminent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    a. The INS Official Involved in Repatriation Negotiations with Cambodia Averred That Establishment of a Repatriation Agreement Would Not Result in the Repatriation of All Cambodian Nationals . . . . 15

    b. The First Secretary of the Royal Embassy of Cambodia Conceded That Not All Cambodian Nationals Would Be Accepted for Repatriation in the Event That the Two Governments Reached an Agreement Regarding Repatriation . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4. This Court Has Considered These Statements in Similar Cases and Concluded That Repatriation of Cambodian Nationals Would Still Remain Speculative in the Event That the Two Governments Reached an Agreement Regarding Repatriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5. The Cambodian Government Has Expressly Denied Issuance of Travel Documents or Failed Entirely to Respond to Respondents' Requests for Travel Documents for Similarly Situated Cambodian Detainees in the San Diego District of the INS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6. INS Documents in Petitioner's Case Demonstrate That No Significant Likelihood of Removal Exists in the Reasonably Foreseeable Future . . . . . . . . 19

7. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D. Respondents Have Failed to Prove that a Significant Likelihood of Removal Exists in the Reasonably Foreseeable Future . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E. Respondents Cannot Continue to Detain Petitioner Even If His Repatriation Is Significantly Likely in the Reasonably Foreseeable Future . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

Addington v. Texas, 441 U.S. 418 (1979) .......................................... 10

Brown v. Allen, 344 U.S. 443 (1953) ............................................. 7

Duong v. INS, 118 F.Supp.2d 1059 (S.D. Cal. 2000) ................................ 12

Foucha v. Louisiana, 504 U.S. 71 (1992) ..................................... 10,12

Hendricks, supra, at 368, 117 S. Ct. 2072 ...................................... 23

Johnson[ v. Eisentrager, 339 U.S. 763, ......................................... 11

Kansas v. Hendricks, 521 U.S. 346 (1997) ...................................... 23

Kwong Hai Chew v. Colding, 344 U.S. 590 (1953) ................................ 11

Landon v. Plasencia, 459 U.S. 21 (1982) ....................................... 11

Ma v. Ashcroft, 257 F.3d 1095 (9th Cir. 2001) ............................. 6,7,11,13

Ma v. Reno, 208 F.3d 815 (9th Cir. 2000) ...................................... 21

Mathews v. Diaz, 426 U.S. 67 (1976) ........................................... 11

Phan v. INS, 56 F.Supp.2d 1149 (W.D. Wash. 1999) (en banc) ..................... 12

Plyler v. Doe, 457 U.S. 202 (1982) ............................................. 11

Wong Wing v. United States, 163 U.S. 228 (1896) ............................... 11

Yick Wo v. Hopkins, 118 U.S. 356 (1886) ....................................... 11

Zadvydas v. Davis, 533 U.S. 678 (2001) ................................... *passim*

## DOCKETED CASES

Aphayavong v. INS, Case No. 00CV0804-J (LAB) .................................. 17

Chaydy v. INS, Case No. 00CV1687-J (JAH) ................................ 14,15,18

Kamalvand v. INS, Case No. 01CV1990-J (POR) ............................. 10,13,20

Krboyan v. INS, Case No. 02CV0934-J (NLS) ..................................... 13

Rithy v. INS, Case No. 99CV0789-IEG (CGA) .................................. 18,21

## FEDERAL STATUTES

8 U.S.C. § 1231(a)(1)(B)(i) ............................................. 1,2,3,4,9,23

28 U.S.C. § 2241(c)(3) ......................................................... 7

## FEDERAL REGULATIONS

66 Fed. Reg. 38433 ......................................................... 4,8,10

66 Fed. Reg. 56967 ............................................................ 12

8 C.F.R. § 241.1(b) ............................................................ 1

8 C.F.R. § 241.4(g) ...................................................... 18,19,20

8 C.F.R. § 241.13 ...................................................... 4,5,8,9,10,12

# I.

## INTRODUCTION

On October 4, 2002, Petitioner applied to the Court for a Writ of Habeas Corpus to remedy his unlawful detention by Respondents. Petitioner is in custody of the Immigration and Naturalization Service ("INS"). This Court issued an Order setting a briefing schedule on November 1, 2002. See November 1, 2002 Order to Show Cause. The Supreme Court's decision in Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), controls the inquiry into this matter. The Supreme Court in Zadvydas held that if an alien's removal is not reasonably foreseeable, continued detention of that alien beyond one-hundred eighty days is unreasonable and no longer authorized by the post-removal-period detention statute. Zadvydas, 533 U.S. at 689.

Pursuant to the Court's holding in Zadvydas, the INS's continued detention of Petitioner violates §1231(a)(6) because, given that the government of Cambodia has not issued travel documents to effectuate Petitioner's removal, and there is no prospect such travel documents will be provided in the foreseeable future, "there is no significant likelihood of removal in the reasonably foreseeable future." Id. Therefore, Petitioner must be released under the conditions set out in § 1231(a)(3).

# II.

## FACTUAL BACKGROUND

**A.    Petitioner's Immigration Background.**

Petitioner lawfully entered the United States as a refugee on December 18, 1985. See Post Order Custody Review Worksheets for File Review ("Custody Review Worksheets") (Attached hereto as Exhibit 1). Petitioner later adjusted his status to that of Lawful Permanent Resident on October 27, 1987. Id. Respondents identify Petitioner as a citizen of Cambodia and born in Thailand. Id. Petitioner entered Respondents' custody on March 19, 2001. Id.

An immigration judge ordered him removed to Cambodia on February 28, 2002. See Copy of Order of the Immigration Judge (Attached hereto as Exhibit 2). Petitioner waived appeal of the immigration judge's order of removal, which became administratively final on February 28, 2002. Id.; see also 8 C.F.R. § 241.1(b) (order is administratively final upon waiver of appeal). Petitioner's waiver of appeal commenced the 180-day removal period. See 8 U.S.C. § 1231(a)(1)(B)(i).

1  On April 4, 2002, Respondents formally requested a travel document from the government of

2  Cambodia.[1]  See Letter from James Dickerson, Deportation Officer, INS, to Consul General, Royal Embassy

3  of Cambodia (4/4/02) (Attached hereto as Exhibit 5).  On April 8, 2002, Mr. Ly Touch, an official of the

4  government of Cambodia, informed Mr. Dickerson that no agreement was yet in place regarding removal of

5  Cambodian nationals from the United States and will hold the travel document request until some future time.

6  See Memorandum to File (4/8/02) (Attached hereto as Exhibit 6).

7  **B.      Establishment of the "Joint Commission" on Repatriation.**

8         On March 22, 2002, the United States and Cambodia signed a document entitled "Memorandum

9  Between the government of the United States and the Royal Government of Cambodia for the Establishment

10  and Operation of a United States-Cambodia Joint Commission on Repatriation."  See Copy of Memorandum

11  Between the government of the United States and the Royal Government of Cambodia for the Establishment

12  and Operation of a United States-Cambodia Joint Commission on Repatriation ("Memorandum") (Attached

13  hereto as Exhibit 7).  The Memorandum appeared to regulate repatriation, although it is not entitled a

14  repatriation agreement, on a case by case basis.  Id.

15         The governments of the United States and Cambodia agreed, among other things, that "[e]ach

16  repatriation request should be considered and decided individually, on a case-by-case basis . . .."  See

17  Memorandum at 1.  According to the Memorandum, responses to requests for travel documents must occur

18  "not later than 30 days from the date of receipt of the request, unless otherwise agreed."  Id. (emphasis added).

19  "In all cases of refusal, the Central Authority of the requested State should state its reasons in writing and

20  should refer the request to the Commission for consideration."[2]  Id. at 2-3.  In cases where the requested State

21  "accepts a repatriation request, it should simultaneously issue a travel document, valid for at least 60 days, to

22  permit the individual's return."  Id. at 3.

23  //

24  ─────────────────────────

25       [1] Respondents had requested a travel document also on March 5, 2002.  See Letter from James Dickerson,
    Deportation Officer, INS, to Consul General, Royal Embassy of Cambodia (3/5/02) (Attached hereto as Exhibit 3).
26  The government of Cambodia denied this request.  See Letter from Ly Touch, Second Secretary and Consul, Royal
    Embassy of Cambodia (Attached hereto as Exhibit 4).

27       [2] The Memorandum identifies the "Joint Commission" as a forum for "discussion and resolution of
    repatriation policy and individual repatriation requests refused by the Central Authority of the requested State."
28  See Memorandum at 2 (emphasis added).  It is apparent that the two governments acknowledged that not all travel
    document requests would be granted and that not all Cambodian nationals would be repatriated.

C.     **Post-Memorandum Removal Efforts in Petitioner's Case Remain Unfruitful.**

As stated above, On April 4, 2002, Respondents forwarded a second formal request for a travel document to the government of Cambodia. See Exhibit 5. The letter forwarded to that government provided a brief statement regarding Petitioner's background, including his birth in a refugee camp in Thailand to Cambodian parents, his parents' places of birth in Cambodia and a claim that Petitioner had relatives who resided in Cambodia. Id. Respondents submitted forms to that government detailing Petitioner's biographical history, including an I-217, which is entitled information for travel document or passport. See I-217 (Attached hereto as Exhibit 8).

On April 8, 2002, a Cambodian official informed Mr. Dickerson the request for a travel document could not processed because "as of 4/8/02 - no agreement [existed] yet." See Exhibit 6. Accordingly, the application would be kept on "hold." Id.

Thereafter, Respondents in the San Diego District of the INS requested assistance from INS Headquarters in Washington, D.C., in obtaining a travel document. See Custody Review Worksheets.

On May 22, 2002, Respondents conducted a post-order custody review of Petitioner's detention case. See Custody Review Worksheets. Respondents noted that the initial travel document request sent to the government of Cambodia was denied. Id. A second request, however, had been sent prior to the commencement of the review. Id. According to the officer who prepared the Custody Review Worksheets:

> [Petitioner's] application for travel documents is at this time under consideration by the Consul General of Cambodia, and has been referred to Headquarter[s] INS OPS/Travel Document Unit for tracing and assistance.
>
> I recommend that he be continued in custody during the interim that a travel document application is pending. It is at this time perceived to be imminent and impending in issuance to allow for his removal to Cambodia.

Id. On May 29, 2002, subsequent to the administrative custody review, the District Director ordered Petitioner continued in INS detention. Id.

On June 28, 2002, in accordance with the requirement that he not hinder attempts to effect his removal, Petitioner drafted a letter to Ly Touch at the Royal Embassy of Cambodia requesting a travel document in his case. See Letter from Sophea Hang to Ly Touch, Royal Embassy of Cambodia (6/28/02) (Attached hereto as Exhibit 9). Petitioner sent this letter to Mr. Dickerson, who would in turn forward his letter to the Cambodian Embassy. See Letter from Sophea Hang to James Dickerson (Attached hereto as

1  Exhibit 10). Mr. Dickerson instructed Petitioner to send the request to the INS for routing to the appropriate

2  Cambodian officials. See Exhibit 9.

3      On August 3, 2002, an official for the INS's Headquarters Post-Order Detention Unit ("HQPDU")

4  informed Petitioner that he would continue to be detained in Respondents' custody.[3] See Decision to Continue

5  Detention (Attached hereto as Exhibit 11). The letter stated that:

6  > Removals of Cambodian citizens have resumed with increasing frequency. There is a strong
   > possibility that a travel document will be available for your removal in the reasonably
7  > foreseeable future. Your criminal record is violent in nature and there is nothing in your file
   > that shows that you would remain non-violent and not pose a threat to the community.
8

9  Id. Another review would be provided in one year from the date of the notice. See Exhibit 11.

10     The one-hundred eighty day statutory removal period set forth by the Supreme Court in Zadvydas

11 expired on or about August 27, 2002, prompting Petitioner to file the instant petition on October 4, 2002.

12     Since expiration of the removal period and commencement of the instant habeas proceedings,

13 Respondents have not conducted a review to determine whether there is a significant likelihood of removal in

14 the reasonably foreseeable future, which is required pursuant to procedures set forth in 66 Fed. Reg. 38433.

15 See 66 Fed. Reg. 38433, 2001 WL 825919 (July 24, 2001); see also 8 C.F.R. § 241.13 (2001) (setting forth

16 regulations regarding INS Headquarters administrative review procedures).

17     In early October 2002, officials from the Cambodian government interviewed several Cambodian

18 detainees, including Petitioner, in San Diego, California. See Return at 7. According to another Cambodian

19 national who had been interviewed, these officials asked questions regarding a detainee's background, date

20 of birth, place of birth, place of birth of his family, whether he had any family residing in Cambodia, how much

21 family resided in the United States, how long he and his family have been in the United States, what

22 language(s) he spoke, whether he had a criminal history, whether his parents have traveled to Cambodia

23 recently, and whether he had a place to live if he were to be returned to Cambodia. See e.g., Copy of

24 November 7, 2002 Declaration of Kinine Kim at ¶ 4 (Attached hereto as Exhibit 12). Despite this meeting,

25 no travel document has been issued and the government of Cambodia has failed to indicate whether it intends

26 to do so.

27

28
---
[3] Respondents claimed in the Return that this notice constituted a decision pursuant to the INS
Headquarters Review procedure followed by the HQPDU. See Return at 7.

1    In a letter dated October 17, 2002, Petitioner requested that Respondents release him from detention

2   on the bases that the statutory removal period expired and that the INS was unable to effectuate his removal

3   to Cambodia. See Letter from Jason I. Ser, Attorney, Federal Defenders of San Diego, Inc., to Glen Beck,

4   Deportation Officer, INS (10/17/02) (Attached hereto as Exhibit 13). Petitioner provided evidence in support

5   of his position that his removal was not significantly likely in the form of documents from Petitioner's own

6   removal case and those from cases of similarly situated detainees in which the government of Cambodia either

7   denied requests for travel documents or failed to respond. Id. In spite of Petitioner's letter requesting release,

8   neither Respondents nor HQPDU responded. See 8 C.F.R. § 241.13(e)(1) (stating that "[w]ithin 10 business

9   days after the HQPDU receives the request (or, if later, the expiration of the removal period), the HQPDU

10  shall respond in writing to the alien, with a copy to counsel fo record . . ..") (emphasis added).

11                                              **III.**

12                                          **ARGUMENT**

13  **A.      The Supreme Court's Decision in Zadvydas Controls This Matter.**

14          The Supreme Court's decision in Zadvydas is squarely on point with the instant case. Zadvydas

15  controls the inquiry into Respondents' ability to effectuate Petitioner's removal from the United States and

16  hence, the lawfulness of Petitioner's detention beyond the removal period.  Petitioner submits that he has

17  demonstrated "good reason" to believe that "a significant likelihood" of removal does not exist as required by

18  Zadvydas.  533 U.S. at 689.  The Supreme Court's decision required the INS to rebut this showing and

19  demonstrated that a "significant likelihood of removal [exists] in the reasonably foreseeable future." Id.

20  (emphasis added). Respondents have failed to do so in their Return. Respondents provided no indication that

21  they can effectuate the instant Petitioner's repatriation and, as a result, cannot give any estimate of when

22  removal might occur.

23          Instead, Respondents relied upon a recently signed Memorandum between the governments of the

24  United States and Cambodia, which established a "Joint Commission" on repatriation; in turn, Respondents

25  submitted that Petitioner's removal, like all other Cambodians under final order of removal, can now be

26  effectuated.[4]  See Return at 8-9. Respondents also requested a stay of the instant proceedings to permit an

27

28  ───────────────────

        [4] It may be worthy to note that Respondents do not refer to this Memorandum as a repatriation agreement
    or a functioning agreement.

administrative review by INS Headquarters in Washington, D.C. See Return at 5-7. However, where the INS

cannot demonstrate that a "significant likelihood of removal [exists] in the reasonably foreseeable future," the

INS must release the alien from custody. Zadvydas, 533 U.S. at 689; see also Ma v. Ashcroft, 257 F.3d 1095,

1105 (9th Cir. 2001) ("In cases in which an alien has already entered the United States and there is no

reasonable likelihood that a foreign government will accept the alien's return in the reasonably foreseeable

future, we conclude that the statute does not permit the Attorney General to hold the alien for more than a

reasonable period beyond that removal period. Rather, the alien must be released subject to the supervisory

authority provided in the statute.") (internal citation omitted) (emphasis added)).

**B. No Deferral to the INS's Administrative Determination Is Permitted or Warranted.**

**1. The Supreme Court in <u>Zadvydas</u> Held That the Habeas Court Must Conduct a Separate Analysis of an Alien's Removability and Should Not Defer to the Government's View about Whether the Implicit Statutory Limitation Is Satisfied in a Particular Case.**

Respondents urge this Court to "sustain" the HQPDU decision regarding the likelihood of Petitioner's

removal to Cambodia and deny the petition. See Return at 5. Respondents have posited that the Court should

accord this administrative determination deference given their expertise in the removal of aliens from the

United States simply because Congress entrusted with administering the nation's immigration laws.

Respondents' position is without merit and has no legal support in light of the Supreme Court's decision in

Zadvydas.

The Supreme Court expressly rejected Respondents' current rationale for staying a determination of

the instant petition. Respondents proffered a similar argument to the Supreme Court in Zadvydas. The

majority observed that "[t]he Government seems to argue that, even under our interpretation of the statute,

a federal habeas court would have to accept the Government's view about whether the implicit statutory

limitation is satisfied in a particular case, conducting little or no independent review of the matter. [However],

[i]n our view, that is not so." Zadvydas, 121 S.Ct. at 2503. The Supreme Court in Zadvydas specifically held

that the district court must consider "[w]hether a set of particular circumstances amounts to detention within,

or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or

is not, pursuant to statutory authority." Id. at 2503-04.

//

The basic federal habeas corpus statute grants the federal courts authority to answer that question. See 28 U.S.C. § 2241(c)(3) (granting courts authority to determine whether detention is "in violation of the ... laws ... of the United States"). In doing so the courts carry out what this Court has described as the "historic purpose of the writ," namely "to relieve detention by executive authorities without judicial trial." Brown v. Allen, 344 U.S. 443, 533, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring in result).

In answering that basic question, the habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. [The habeas court] should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the [habeas] court should hold continued detention unreasonable and no longer authorized by statute.

Zadvydas, 121 S.Ct. at 2504 (emphasis added).

The Supreme Court's decision in Zadvydas also does not require a habeas court to afford deference to Respondents' "view about whether the implicit statutory limitation is satisfied in a particular case." Zadvydas, 121 S.Ct. at 2503.

We recognize, as the Government points out, that [habeas] review must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to "speak with one voice" in immigration matters. Brief for Respondents in No. 99-7791, at 19. But we believe that [habeas] courts can take appropriate account of such matters without abdicating their legal responsibility to review the lawfulness of an alien's continued detention.

Zadvydas, 121 S.Ct. at 2504 (emphasis added); see also Ma, 257 F.3d at 1110 ("[T]he Supreme Court's cases make clear that the plenary power doctrine does not apply in the same way to each case to which it is relevant, and that its exercise is subject to constitutional restraints.").

The Supreme Court has ruled that this Court is capable of rendering a decision regarding Respondents' ability, or inability in this case, to effectuate Petitioner's removal from the United States.[5] Thus, this Court cannot and should not subordinate its legal responsibility to review the lawfulness of Petitioner's detention to any administrative reviews conducted by Respondents. See Zadvydas, 121 S.Ct. at 2504 ("In

---

[5] The majority also rejected Respondents' separation of powers argument in the context of this analysis: Nor do the cases before us require us to consider the political branches' authority to control entry into the United States. Hence we leave no "unprotected spot in the Nation's armor." Neither do we consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security. The sole foreign policy consideration the Government mentions here is the concern lest courts interfere with "sensitive" repatriation negotiations. But neither the Government nor the dissents explain how a habeas court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity, could make a significant difference in this respect.
See Zadvydas, 121 S. Ct. at 2502 (citations omitted).

1 order to limit the occasions when courts will need to [review the lawfulness of an alien's continued detention],
2 we think it practically necessary to recognize some presumptively reasonable period of detention."). The Court
3 should not defer to any administrative review of Petitioner's repatriation.

### 2. Furthermore, the August 3, 2002 Order by the HQPDU Does Not Constitute a Decision Pursuant to the July 19, 2001 Memorandum by the Attorney General or New Review Procedures Set Forth at 8 C.F.R. § 241.13.

6      In his July 19, 2001 Memorandum, the Attorney General "direct[ed] the INS to draft and present to
7 [him] regulations on or before July 31, 2001, that set forth a procedure for aliens subject to a final order of
8 removal . . . to present a claim that they should be released from detention because there is no significant
9 likelihood that they will be removed in the reasonably foreseeable future." See 66 Fed. Reg. 38433, 2001 WL
10 825919 (Jul. 24, 2001). Accordingly, the INS drafted 8 C.F.R. § 241.13, which it entitled "[d]etermination
11 of whether there is a significant likelihood of removing a detained alien in the reasonably foreseeable future."
12 The Attorney General approved the INS's proposal, which resulted in enactment at 8 C.F.R. § 241.13. As
13 Respondents indicated, 8 C.F.R. § 241.13, effective November 14, 2001, "modifie[d] and add[ed] structure
14 to the Attorney General's July 19, 2001 interim procedures." See Return at 5, n.7. That section currently
15 regulates any and all HQPDU review procedures in cases where a detained, non-removable alien requests
16 release from detention pursuant to the Supreme Court's holding in Zadvydas.

17      Section 241.13 sets forth in pertinent part:

18     Determination of whether there is a significant likelihood of removing a detained alien in the
19     reasonably foreseeable future.

20         (a) Scope. This section establishes special review procedures for those aliens who are
subject to a final order of removal and are detained under the custody review
21         procedures provided at § 241.4 after the expiration of the removal period, where the
alien has provided good reason to believe there is no significant likelihood of removal
22         to the country to which he or she was ordered removed, or to a third country, in the
reasonably foreseeable future.

23 See 8 C.F.R. § 241.13 (emphasis added). According to the unambiguous language defining the applicable
24 scope of § 241.13, HQPDU only becomes authorized to render decisions and determinations of whether there
25 is a significant likelihood of removing a detained alien in the reasonably foreseeable future "after the expiration
26 of the removal period." See 8 C.F.R. § 241.13(a) (emphasis added).

27      Respondents' HQPDU notice to Petitioner of his continued detention could not have occurred
28 pursuant to the procedure set forth at § 241.13. The HQPDU rendered a conclusion that Petitioner's removal

was a "strong possibility" on August 3, 2002 and ordered Petitioner to be continued in detention on that basis. See Exhibit 11. The 180-day statutory removal in Petitioner's case, however, did not expire until August 27, 2002 given the administratively final order of removal from February 28, 2002. See Custody Review Worksheets. The August 3, 2002 decision, therefore, did not fulfill Respondents' regulatory obligation, and Petitioner's regulatory right, to consider Petitioner's detention in light of his removal subsequent to expiration of the removal period as required.

This is consistent with the holding in Zadvydas, which concluded that the Attorney General has authority under 8 U.S.C. § 1231(a)(3) to detain a non-removable alien up to 180-days where removal is not likely in the future. See Zadvydas, 533 U.S. at 691. If detention is presumptively lawful for that period of time, surely the Attorney General's regulations would not require any HQPDU determination until the 180-day period expired.

The Court should not characterize the August 3, 2002 notice resulting in Petitioner's continued detention a decision by the HQPDU pursuant to the July 19, 2001 Memorandum or 8 C.F.R. § 241.13.

  **3.**   **Petitioner's "Weighty Due Process Rights" in Conjunction with the Zadvydas Decision Militate Against a Deferral to Any Future Administrative Determination by the HQPDU, Which Is Currently Overdue in Violation of Procedural Requirements Set Forth at 8 C.F.R. § 241.13.**

Petitioner initiated the instant proceedings on October 4, 2002. On October 17, 2002, Petitioner also requested that the HQPDU order him releases given expiration of the statutory removal period discussed in Zadvydas and the INS's inability to effectuate his removal in the foreseeable future. See Exhibit 13. Nevertheless, Respondents' HQPDU has not conducted any review of Petitioner's likelihood of removal in response and has not responded to either Petitioner or counsel. The lack of a response places the HQPDU in violation of the procedural requirements at 8 C.F.R. § 241.13.

Section 241.13(e) required the HQPDU to provide, at least, an initial response to Petitioner's October 17, 2002 written request for release:

//

//

Review by HQPDU.

> (1) Initial response. <u>Within 10 business days</u> after the HQPDU receives the request (or, if later, the expiration of the removal period), the HQPDU shall respond in writing to the alien, with a copy to counsel of record, by regular mail, acknowledging receipt of the request for a review under this section and explaining the procedures that will be used to evaluate the request. The notice shall advise the alien that the Service may continue to detain the alien until it has made a determination under this section whether there is a significant likelihood the alien can be removed in the reasonably foreseeable future.

8 C.F.R. § 241.13(e) (emphasis added). Furthermore, the regulations promulgated after <u>Zadvydas</u> also required the INS to "treat [Petitioner's] petition for a writ of habeas corpus challenging his post-detention order as . . . a request for release." <u>See</u> 66 Fed. Reg. 38433.

This Court has held that a non-removable alien's "weighty due process rights" in conjunction with the <u>Zadvydas</u> decision militated against any deferral to an administrative determination:

> [T]he INS has offered a dearth of evidence that there is a significant likelihood of Petitioner's removal. Instead, the INS requests a stay of these proceedings until the INS has made a determination pursuant to new review proceedings in accord with <u>Zadvydas</u>.

> It is clear to this Court that the INS has failed to meet the requisite burden of establishing a significant likelihood of removal in the months Petitioner has been in custody. Petitioner's weighty due process rights and the Supreme Court's explicit mandate in <u>Zadvydas</u> require this Court to grant Petitioner immediate habeas relief.

<u>Kamalvand v. INS</u>, Case No. 01CV1990-J (POR) (S.D. Cal. Feb. 13, 2002) (Order Granting Writ of Habeas Corpus) (unpublished opinion), slip op. at 3 (citations omitted). Respondents in this case, as in <u>Kamalvand</u>, have not made a determination pursuant to the new review proceedings concerning Petitioner's likelihood of removal. Accordingly, this Court should not consider deferring to any future administrative determination regarding the likelihood of Petitioner's removal.

> **4.** **Respondents Seek to Rely Upon Regulations that Violate Petitioner's Right to Substantive and Procedural Due Process.**

> **a.** **Petitioner Is Entitled to Due Process.**

"[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); <u>Addington v. Texas</u>, 441 U.S. 418, 425 (1979) ("[C]ivil commitment for any purpose constitutes a significant

1  deprivation of liberty that requires due process protection.").

2  As a lawful permanent resident of the United States, Petitioner has a constitutional right to substantive

3  and procedural due process that he cannot be stripped of merely by entry of a final order of deportation. The

4  Supreme Court in Zadvydas acknowledged that a non-removable alien with a final order of removal retains

5  due process rights under the Fifth Amendment to the United States Constitution. 121 S.Ct. at 2501. The

6  Court cited the historical distinction among "an alien who has effected an entry into the United States, and one

7  who has never entered . . ." in support of this conclusion. 121 S.Ct. at 2500-01; see also Kwong Hai Chew

8  v. Colding, 344 U.S. 590, 596 (1953)("It is well established that if an alien is a lawful permanent resident of

9  the United States and remains physically present there, he is a person within the protection of the Fifth

10  Amendment."); Landon v. Plasencia, 459 U.S. 21, 25, 33 (1982) (same). In Zadvydas, the Supreme Court

11  rejected the INS's assertions that aliens lawfully admitted into the United States and later ordered deported

12  were analogous to excludable aliens who, in challenging their detention, can assert only diminished

13  constitutional protection:

14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent. See Plyler v. Doe, 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); Kwong Hai Chew v. Colding, 344 U.S. 590, 596-598, and n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953);Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); cf. [Shaughnessy v. United States ex rel.] Mezei, [345 U.S. 206] at 212, 73 S.Ct. 625 ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"). Indeed, this Court has held that the Due Process Clause protects an alien subject to a final order of deportation, see Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896), though the nature of that protection may vary depending upon status and circumstance, see Landon v. Plasencia, 459 U.S. 21, 32-34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); Johnson[ v. Eisentrager, 339 U.S. 763] at 770, 70 S.Ct. 936.

24  
***

25  
26  
27  
> In light of this critical distinction between Mezei and the present cases, Mezei does not offer the Government significant support, and we need not consider the aliens' claim that subsequent developments have undermined Mezei's legal authority. (citations omitted). Nor are we aware of any other authority that would support Justice KENNEDY's limitation of due process protection for removable aliens to freedom from detention that is arbitrary or capricious. See [Zadvydas, 121 S.Ct.], at 2513-2515 (dissenting opinion).

28  See Zadvydas, 121 S.Ct. at 2500 (citations omitted); see also Ma, 257 F.3d at 1109 ("[O]ur case law makes

clear that, as a general matter, aliens who have entered the United States, legally or illegally, are entitled to the protections of the Fifth Amendment.").

Accordingly, the Supreme Court concluded that "[a] statute permitting indefinite detention of an alien [who has effected an entry into the United States] would raise a serious constitutional problem [under] [t]he Fifth Amendment's Due Process Clause[, which] forbids the Government to 'deprive' any 'person . . . of . . . liberty . . . without due process of law.' Freedom from imprisonment--from government custody, detention, or other forms of physical restrain--lies at the heart of the liberty that Clause protects. See Foucha v. Louisiana, 504 U.S. 71, 80 (1992)." Zadvydas, 121 S.Ct. at 2500.

**b.    The Regulations Violate Petitioner's Due Process Rights.**

Regulations contained at 8 C.F.R. § 241.13 as well as the July 24, 2001 Memorandum referred to by Respondents in their Return regarding administrative review and release procedures, which places the burden of proof upon the alien to demonstrate that there is no significant likelihood of removal, places decision making responsibilities in hands of "the INS," fails to establish a length of time by which a determination must be made and lacks cognizable criteria or guidance for INS officials responsible for rendering the determination, raises substantive and procedural due process concerns.[6] See Duong v. INS, 118 F.Supp.2d 1059, 1064-65 (S.D. Cal. 2000) (holding that it is "excessive" to detain an alien indefinitely if deportation will never occur violating alien's right to substantive due process and that procedures in place to review detention fail to provide adequate procedural due process protection given that, among other things, final decision of whether to release the alien is made by the INS District Director instead of an impartial party); Phan v. INS, 56 F.Supp.2d 1149, 1155 (W.D. Wash. 1999) (en banc) (same); see also Zadvydas, 121 S. Ct. at 2500 ("The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such [procedural due process] protection is obvious.").

---

[6] For example, pursuant to the recently enacted regulations at 8 C.F.R. § 241.13, once the statutory removal period has expired, an "alien must provide 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future,' [Zadvydas,] 121 S. Ct. at 2505, and may submit any information that may be relevant to support that contention." 66 Fed. Reg 56967, 56970; but see Zadvydas, 121 S.Ct. at 2549-50 (discussing serious constitutional problems associated with indefinite detention, such as the minimal procedural protections available to the alien found in administrative proceedings, where the alien bears the burden of proving he is not dangerous). Furthermore, Respondents' position that § 241.13 eliminated the duty to issue a determination as to the likelihood of removal within a 30 day period thoroughly clouds when, if ever, such a determination is due. But see 8 C.F.R. § 241.13(b)(2)(ii) (possibly requiring determination as to likelihood of removal by end of 180-day removal period).

These Constitutional deficiencies preclude Respondents from relying upon them as a reason for this Court to defer to any findings and conclusions rendered by the HQPDU. "Petitioner's weighty due process rights and the Supreme Court's explicit mandate in Zadvydas require this Court to grant Petitioner immediate habeas relief." Kamalvand v. INS, Case No. 01CV1990-J (POR) (S.D. Cal. Feb. 13, 2002) (unpublished opinion), slip op. at 3 (citations omitted).

**C.    Petitioner's Removal from the United States Is Not Significantly Likely in the Reasonably Foreseeable Future Despite the Newly Signed Memorandum.**

    **1.    Ma v. Reno Contemplated the Existence of a Fully "Functioning" Agreement Regarding Repatriation in Determining Whether the Removal of an Alien Indefinitely Detained by the INS Is Significantly Likely in the Reasonably Foreseeable Future.**

Repatriation to Cambodia for any or all nationals of that country is not a certainty despite the existence of an agreement regarding repatriation. The Ninth Circuit in Ma v. Ashcroft identified two factors to be considered by a habeas court in a determination of whether removals to Cambodia are significantly likely in the reasonably foreseeable future. Respondents must not only demonstrate the establishment of an agreement regarding repatriation, but also that any established agreement is "functioning" in a manner that is indicative of the INS's ability to accomplish a detainee's removal, to a significant degree, in the reasonably foreseeable future.[7] See Ma v. Ashcroft, 257 F.3d at 1115. The Court in Ma expressly stated that "the United States has no functioning repatriation agreement with [Cambodia], that the Cambodian government does not presently accept the return of its nationals from the United States, and that it has not announced a willingness to enter into an agreement to do so in the foreseeable future." Id. (emphasis added). The Court's subsequent footnote clarified and emphasized the distinction to be drawn by a habeas court between the two factors. Relying upon averments by a State Department official involved in the repatriation negotiations, the Court opined that its conclusion was consistent with the official's inability to predict "when a repatriation agreement will be established and begin to function." Id. at 1116, n.31. Thus, the mere fact that an agreement exists is not wholly dispositive of whether Respondents can effectuate Petitioner's removal in the reasonably

---

[7] The Memorandum signed by the governments of the United States and Cambodia is not a cure-all with respect to the hundreds, if not thousands, of non-deportable Cambodian nationals nor is the Memorandum dispositive of the instant petition in Respondents' favor. The Memorandum simply renders this Court's consideration of Respondents' ability to effectuate Petitioner's removal akin to that of a detainee whose country shares an agreement with the United States regarding repatriation, such as an Armenia or China, but has expressly denied a travel document or failed to respond. See e.g., Krboyan v. INS, Case No. 02CV0934-J (NLS) (S.D. Cal. Aug. 14, 2002) (Order Granting Petition for Writ of Habeas Corpus) (unpublished opinion).

1 foreseeable future.[8]

2 **2. The Memorandum Establishing a "Joint Commission" Does Not Constitute a Fully "Functioning" Agreement Regarding Repatriation and, On Its Own, Does Not Support the Proposition That Petitioner's Removal to Cambodia Is Significantly Likely in the Reasonably Foreseeable Future.**

5 Respondents proffered that the "Joint Commission" established by the governments of the United

6 States and Cambodia on March 22, 2002 constitutes evidence that all Cambodians under final orders of

7 removal face a significant likelihood of removal in the reasonably foreseeable future. See Return at 8-9.

8 Accordingly, Respondents proffered that Petitioner's removal to Cambodia is significantly likely in the

9 reasonably foreseeable future and requested denial of the petition. However, the establishment of the "Joint

10 Commission" cannot be considered akin to a fully "functioning" agreement regarding repatriation in the sense

11 that it does not guarantee a significant likelihood of removal in the reasonably foreseeable future for all

12 Cambodian nationals under final order. See Chaydy v. INS, Case No. 00CV1687-J (JAH) (S.D. Cal. Oct. 5,

13 2000) (Order Grating Petitioners' Writ of Habeas Corpus) (unpublished opinion) (stating that "even if the joint

14 statement is [] an agreement [regarding repatriation], it is highly speculative as to whether the Cambodian

15 government will accept these particular petitioners for repatriation").

16 The language contained in the Memorandum, which provides a case by case approach to travel

17 document applications, does not guarantee issuance of a travel document in all cases. Removal of Cambodian

18 nationals, at the very least, remains speculative. The governments of the United States and Cambodia agreed

19 that "[e]ach repatriation request should be considered and decided individually, on a case-by-case basis . . .."

20 See Memorandum at 1 (emphasis added). The two governments also agreed to "tak[e] into account the

21 humanitarian and compassionate aspects of each case . . .." Id. Point in fact, the Memorandum identified one

22 of the duties of the "Joint Commission" as a forum for "discussion and resolution of repatriation policy and

23 individual repatriation requests refused by the Central Authority of the requested State." Id. at 2 (emphasis

24 added). Thus, the Memorandum specifically conceived of instances where applications for travel documents

26 _____

27 [8] The minimal number of successful repatriations in light of the total number of Cambodian nationals in the United States under final order of removal, as well as the lack of any removals from the San Diego District of the INS, are demonstrative of this fact. Petitioner respectfully requests this Court to permit him to conduct

28 discovery into the numbers of successful removals in the context of all Cambodians, both detained and released from detention, in the United States under final order of removal if it concludes that the recent removals support the government's opposition to the petition.

1 would not be approved by the requested government. The Memorandum even prescribed the procedure that

2 applied in cases of refusals: "[i]n all cases of refusal, the Central Authority of the requested State should state

3 its reasons in writing and should refer the request to the Commission for consideration." Id. at 2-3.

4       Simply stated, the Memorandum does not mean that a significant likelihood removal exists for the

5 instant Petitioner and this document does not suffice to rebut Petitioner's showing of "good reason" to believe

6 that his removal is not significantly likely in the reasonably foreseeable future.

7     **3.**    **Statements by INS and Cambodian Officials Contradict the INS's Representations that Repatriation of Any and All Cambodian Nationals, Including Petitioner, Is Imminent.**

8

9         **a.**    **The INS Official Involved in Repatriation Negotiations with Cambodia Averred That Establishment of a Repatriation Agreement Would Not Result in the Repatriation of All Cambodian Nationals.**

10

11       Declarations by James Hergen, the State Department official who participated in United States and

12 Cambodian repatriation agreement negotiations, prepared in conjunction with similar habeas proceedings,

13 averred that repatriation of Cambodian nationals was not assured if and when the two governments concluded

14 a repatriation agreement. See e.g., May 5, 2000 Declaration of James G. Hergen ("May 5, 2000 Hergen

15 Dec.") at ¶ 16 (Attached hereto as Exhibit 14). Mr. Hergen's characterization of the "Joint Commission,"

16 albeit prior to its establishment, and its duties certainly does not support the conclusion that any and all

17 Cambodians, including Petitioner, are significantly likely to be removed. He averred that the Memorandum

18 between the governments would likely establishing a "joint commission" on repatriation, not a repatriation

19 agreement. See id. at ¶ 15. Mr. Hergen stated that the United States and Cambodia planned "to commence

20 as soon as possible at the working level to review particular cases - probably in the context of a 'joint

21 commission' model that has been successfully applied to U.S.-Cambodian efforts to locate and repatriate the

22 remains of America MIA's. We reasonably anticipate that such further discussions will bear fruit in the very

23 near future." Id. at ¶ 15. It is permissible, based upon this statement, to conclude that the "joint commission"

24 does not constitute a formally binding or final version of a repatriation agreement, which according to Mr.

25 Hergen is the "fruit" of the future. Id. Furthermore, this "joint commission" will review only "particular

26 cases," which likely means that scores of Cambodians cannot and will not be removed to Cambodia. Id.

27       The intent of the two governments to review only "particular cases" is consistent with a recent

28 memorandum drafted by Deportation Officer James Orrell, who is responsible for detention cases in the San

Diego District of the INS. See Memorandum to File by James M. Orrell, Deportation Officer (7/8/02) (Attached hereto as Exhibit 15).[9] Ly Touch, the Cambodian government's representative who handles deportation cases of detained Cambodian nationals, explained to Mr. Orrell that his government prioritized the possible issuance of travel documents, beginning with the "lame, sick and dying," proceeding to "the elderly," and, finally, "to everyone else." Id. This prioritization further compounds the complexities and unpredictable nature of the "case by case" application scheme discussed above and, more importantly, casts greater doubt upon the likelihood that a travel document will be forthcoming in the instant case. The Cambodian government has not indicated that is prioritizing Petitioner's case or is willing to provide a travel document. See Custody Review Worksheets.

Mr. Hergen also candidly stated that establishment of a repatriation agreement would not result in the repatriation of all Cambodian nationals. See May 5, 2000 Hergen Dec. at ¶ 16. Point in fact, "[Cambodia] was careful to emphasize [] the serious practical difficulties that could attach to confirming nationality in a region that had been so destabilized and ravages by warfare and refugee migration for such a protracted period, particularly where the ostensible nationals had been in the U.S. for lengthy periods." Id. at ¶ 11. Mr. Hergen would not predict when a repatriation agreement, once reached, would become functioning:

> I am strongly of the view that there is a reasonable possibility in the case of all three states that we will be able to negotiate a repatriation agreement in the foreseeable future. This does not, to be sure, mean that such arrangements are imminent, or that they will result in the immediate repatriation of all nationals of the three states who are currently detained in the U.S. under final orders of deportation, exclusion, or removal. By definition, diplomatic negotiations between sovereign states are delicate, difficult, and complex, and it would be foolhardy for me to attempt to predict dates certain for the conclusion of any such arrangements.

Id. at ¶ 16 (emphasis added). Thus, the Memorandum does not immediately permit the inference that Petitioners' repatriation is significantly likely in light of Mr. Hergen's averments.

     **b.    The First Secretary of the Royal Embassy of Cambodia Conceded That Not All Cambodian Nationals Would Be Accepted for Repatriation in the Event That the Two Governments Reached an Agreement Regarding Repatriation.**

A declaration by Linda Harter prepared in a similar case attested, under penalty of perjury, to statements made by Nou Hak, First Secretary of the Royal Embassy of Cambodia regarding the likelihood of deportation in the event that the two governments reached an agreement regarding repatriation. See June 28,

---

[9] This document was contained in Petitioner's A-File as disclosed to counsel by Respondents' FOIA Unit.

1  2000 Declaration of Linda C. Harter ("Harter Dec.") (Attached hereto as Exhibit 16). According to Secretary

2  Hak, travel documents would not be issued by the Cambodian government in all Cambodian repatriation cases.

3  See id. at ¶ 9. According to the Cambodian government official, "in instances where there are no known

4  relative[s] or friends in Cambodia . . . it would be unlikely that travel documents would ever be issued." See

5  Harter Dec. at ¶ 9. Secretary Hak's comments appear consistent with Mr. Hergen's declaration, which averred

6  that the conclusion of a repatriation agreement would not necessarily result in the repatriation of all Cambodian

7  nationals. See May 5, 2000 Hergen Dec. at ¶ 16. Mr. Hak's statements further undermine Respondents' claim

8  that the Memorandum means Petitioner's removal is significantly likely.

9      **4.  This Court Has Considered These Statements in Similar Cases and Concluded That
             Repatriation of Cambodian Nationals Would Still Remain Speculative in the Event
10            That the Two Governments Reached an Agreement Regarding Repatriation.**

11         This Court previously concluded that repatriation of Cambodian nationals may not be significantly

12  likely in the reasonably foreseeable future irrespective of any future agreement regarding repatriation between

13  the governments of the United States and Cambodia.

14         On April 27, [2000,] a Joint Statement was issued by the Royal Government of
           Cambodia and the United States Department of State, Department of Justice, and the
15         INS. (Citation omitted). The Statement reflects that officials from each country met
           and agreed on general principles that should govern the repatriation of each other's
16         nationals. (Citation omitted). James Hergen, a member of the U.S. delegation,
           declares that he expects initial repatriations to occur 'hopefully, within the next
17         several months' but recognizes that it would be foolhardy to attempt to predict a date
           certain for the initiation of repatriations. (Decl. of James Hergen). Attorney Linda
18         A. Harter declares that she has spoken with Nou Hak, First Secretary of the Royal
           Embassy of Cambodia. (Declaration of Linda Harter). According to Harter,
19         Secretary Hak said that there was no time table for the conclusion of a repatriation
           agreement with the United States and that he could not estimate how long
20         negotiations would take. Further, certain aliens may not be accepted if there are no
           known relatives of friends in Cambodia. (Id.).
21
           Considering the evidence presented by both parties, the Court finds that there is not
22         a reasonable likelihood that Cambodia will permit Petitioner's return in the reasonably
           foreseeable future. Currently, there is not a repatriation agreement with Cambodia
23         and it is speculative as to when and if such an agreement may be reached. Even if a
           repatriation agreement is concluded, it is further speculative as to whether the
24         Cambodian government will accept these particular Petitioners under the conditions
           of the agreement. Despite Respondent's optimism that an agreement will be
25         concluded shortly and Petitioners may be removed, until a repatriation agreement has
           been entered into by Cambodia and the U.S., the removal of Petitioners still remains
26         uncertain. Given this uncertainty, holding Petitioners in custody indefinitely in
           untenable.
27

28  Aphayavong v. INS, Case No. 00CV0804-J (LAB) (S.D. Cal. Jul. 5, 2000) (Order Granting Writ of Habeas

1 Corpus) (unpublished opinion), slip op. at 2-3 (emphasis added); see also Rithy v. INS, Case No. 99CV0789-

2 IEG (CGA) (S.D. Cal. Oct. 13, 2000) (Order Granting Petitioner's Motion to Amend Judgment) (unpublished

3 opinion) (noting speculative likelihood of removal for Cambodian nationals in event a repatriation agreement

4 is concluded and citing to declaration of May 5, 2000 James Hergen); Chaydy v. INS, Case No. 00CV1687-J

5 (JAH) (S.D. Cal. Oct. 5, 2000) (same).

6 **5. The Cambodian Government Has Expressly Denied Issuance of Travel Documents or Failed Entirely to Respond to Respondents' Requests for Travel Documents for**

7 **Similarly Situated Cambodian Detainees in the San Diego District of the INS.**

8 Since establishment of the "Joint Commission" on March 22, 2002, the Cambodian government has

9 expressly denied issuance of travel documents or failed to respond to Respondents' requests for travel

10 documents in cases of similarly situated Cambodian nationals detained in the San Diego District of the INS.

11 These decisions support Petitioner's position that his removal is not significantly likely.

12 **Bunreas Pin.**

13 The Cambodian government twice denied issuance of a travel document in writing for this detainee,

14 who the INS identified as a Cambodian citizen and born in Thailand.[10] See Letter from Ly Touch, Second

15 Secretary and Consul, Royal Embassy of Cambodia to Neil Clark, Deportation Officer, INS (5/8/02) (Attached

16 hereto as Exhibit 18); Letter from Ly Touch, Second Secretary and Consul, Royal Embassy of Cambodia to

17 Bunreas Pin (5/6/02) (Attached hereto as Exhibit 19).[11] This detainee even drafted and forwarded his own

18 written request for a travel document to the Cambodian government. See Exhibit 19 (stating that Cambodia

19 government is responding to Mr. Pin's own request for a travel document). Accordingly, on July 3, 2002,

20 Respondents requested assistance from the Regional Director of the Western Region of the INS in obtaining

21 a travel document from the government of Cambodia.[12] See Memorandum for the Regional Director, Western

22 _____

23 [10] Similar to the instant Petitioner, this Cambodian national arrived at the United States as a refugee in 1983 just shy of five years of age. See Post Order Custody Review Worksheets for Bunreas Pin (Attached hereto as

24 Exhibit 17). Like the instant Petitioner, this detainee's entire immediate family resides in the United States, including his parents, siblings and wife. Id.

25 [11] It is significant to note that the letters of denial, issued more than two months after establishment of the "Joint Commission," denied a travel document and stated that no agreement had yet been signed. Such a response

26 by the government of Cambodia serves to cast greater doubt upon the functionality of the March 22, 2002

27 agreement. See also Memorandum by James Dickerson (4/8/02) (memorializing statement by Ly Touch, who replaced Nou Hak, that no repatriation agreement exists) (Attached hereto as Exhibit 6).

28 [12] According to 8 C.F.R. § 241.4(g), entitled travel documents and docket control for aliens continued in detention beyond the removal period, which states in pertinent part:

1 Region, INS (Attached hereto as Exhibit 20).

2 **Phlean Khiaw.**

3      The government of Cambodia also has expressly denied issuance of a travel document for a
4 Cambodian citizen who was born in Cambodia. See Post Order Custody Review Worksheets for Phlean Khiaw
5 (Attached hereto as Exhibit 21). The denial in this case occurred despite a letter written to the government
6 of Cambodia by the detainee himself requesting a travel document. See Letter from Phlean Khiaw to
7 Cambodian Consular (4/23/02) (requesting travel document) (Attached hereto as Exhibit 22); Letter from Ly
8 Touch, Second Secretary and Consul, Royal Embassy of Cambodia, to Phlean Khiaw (5/10/02) (denying
9 request) (Attached hereto as Exhibit 23). It is worthy to note that the response from the Cambodian
10 government in this case occurred after establishment of the "Joint Commission." See id. San Diego District
11 INS officials, thereafter, sought assistance from the Regional Director of the Western Region of the INS. See
12 Memorandum from Adele Fasano, District Director, INS, to Regional Director, Western Region (Attached
13 hereto as Exhibit 24). This request is indicative of an inability to obtain a travel document. See supra note
14 11. Respondents' own request for a travel document in this case remains unanswered. Id.; see also Post Order
15 Custody Review Worksheets for Savarn Kuy (Attached hereto as Exhibit 25) (stating that June 7, 2002 request
16 for travel documents remains unanswered); Post Order Custody Review Worksheets for Toeun Chhin
17 (Attached hereto as Exhibit 26) (stating that April 26, 2002 San Diego District and May 28, 2002 INS
18 Headquarters requests for travel documents remain unanswered).

19      **6.      INS Documents in Petitioner's Case Demonstrate That No Significant Likelihood of
20            Removal Exists in the Reasonably Foreseeable Future.**

21      Respondents' second request for a travel document from the government of Cambodia occurred on
22 April 4, 2002. See Custody Review Worksheets. This request, however, has gone unanswered. Id. The
23 Cambodian government's failure to respond is strong evidence that no travel document is forthcoming. The
24 lack of a response also is in clear violation, and perhaps disregard, of the 30 day period set forth in the

25

26      The district director shall continue to undertake appropriate steps to secure travel documents for the alien
27      both before and after the expiration of the removal period. If the district director is unable to secure travel
        documents within the removal period, he or she shall apply for assistance from Headquarters Detention
        and Deportation, Office of Field Operations.
28 8 C.F.R. § 241.4(g) (emphasis added). This Court should infer that Respondents are unable to obtain travel documents for
     Petitioner because of this request for assistance from INS Headquarters.

Memorandum in which "the requested State should [have] state[d] its reasons in writing [for refusing to issue a travel document]."[13] See Memorandum at 2-3. This Court has deemed a government's failure to respond to a travel document request as indicative of a refusal to provide a travel document. Furthermore, Respondents provide no evidence to demonstrate that Petitioner's removal case has been forwarded to the "Joint Commission" for further consideration of the constructive denial of a travel document.

Sometime between their request for a travel document and preparation of the Custody Review Documents, Respondents requested assistance from the Regional Director of the Western Region of the INS in obtaining a travel document from the government of Cambodia. See Custody Review Worksheets. According to 8 C.F.R. § 241.4(g), this request is indicative of an inability on the part of the San Diego District of the INS to obtain a travel document to effectuate Petitioner's removal. See infra note 12.

Although Respondents decided to continue to detain Petitioner on May 29, 2002 and again on August 3, 2002, subsequent to an administrative custody review, the HQPDU only justified continued detention on the basis that a "strong possibility" existed that a travel document would be available. See Exhibit 11. The notice did not state that a "significant likelihood" of removal existed in the reasonably foreseeable future, which the Supreme Court in Zadvydas determined to be the appropriate standard in assessing the legality of detention.

Petitioner's case is remarkably similar to that of the Thai born Cambodian national for whom the government of Cambodia denied a travel document. See Exhibits 18-20. First, Petitioner was born in Thailand, not Cambodia. See Custody Review Documents. Second, Petitioner arrived in the United States on December 18, 1985, which means that he was less than fours years old.[14] Id. Thus, he arrived more than twenty years ago, which supports the conclusion that Petitioner has become considerably assimilated to American culture since arriving at the United States. These similarities support the conclusion that the

---

[13] This Court expressed concern for a detainee's "weighty due process rights" in the context of failures by INS Headquarters in Washington, D.C., to conduct timely administrative reviews and denied requests to stay proceedings to await such administrative decisions. See e.g., Kamalvand v. INS, Case No. 01CV1990-J (POR) (S.D. Cal. Feb. 13, 2002) (Order Granting Writ of Habeas Corpus) (unpublished opinion), slip op. at 3. The Court should not deviate from this position and should similarly consider such due process implications in the context of the Memorandum's temporal requirements.

[14] The Custody Review Worksheets erroneously stated that Petitioner's date of birth was February 5, 1952. See Custody Review Worksheets. The I-217 accurately reflects Petitioner's date of birth as February 25, 1981. See Exhibit 8. As indicated in Mr. Dickerson's letter to the Cambodian government requesting a travel document, Petitioner's father, Phoeun Hang, was born on February 5, 1952, which likely contributed to the erroneous notation. See Exhibit 5.

1  government of Cambodian will deny or already has decided to deny a travel document in the instant case as
2  well.

3  **7.     Conclusion.**

4  This Court should conclude that despite the establishment of the "Joint Commission," Petitioner's
5  removal is not significantly likely in the reasonably foreseeable future or, at the very least, is so speculative that
6  Respondents have failed to rebut Petitioner's demonstration of "good reason" to believe that removal is not
7  significantly likely in the reasonably foreseeable future.

8  **D.     Respondents Have Failed to Prove That a <u>Significant</u> Likelihood of Removal Exists in the**
   **Reasonably Foreseeable Future.**
9

10  Respondents must demonstrate that a "<u>significant</u> likelihood of removal [exists] in the reasonably
11  foreseeable future." <u>Id.</u> (emphasis added). This scrutiny differs from that originally opined by the Ninth Circuit
12  in <u>Ma v. Reno</u>, 208 F.3d 815, 822 (9th Cir. 2000), which required Respondents to demonstrate only a
13  "reasonable likelihood" that a foreign government will accept the alien's return in the reasonably foreseeable
14  future.  Oxford's English Dictionary defines "reasonable" as "not extravagant or excessive; moderate."
15  OXFORD ENGLISH DICTIONARY (2d ed. 1989). Oxford's English Dictionary defines "significant" as "highly
16  expressive or suggestive." OXFORD ENGLISH DICTIONARY (2d ed. 1989). Thus, the Supreme Court's decision
17  in <u>Zadvydas</u> changed the degree to which Respondents must demonstrate an alien's likelihood of removal and
18  increased their burden to demonstrate the reasonableness of continued detention.  More importantly, this
19  standard lessens the degree to which an alien must demonstrate that the INS cannot effectuate his removal.

20  Respondents have failed to rebut Petitioner's showing of "good reason" to believe that his removal
21  is not "significantly" likely. Respondents provide no indication that Respondents can effectuate Petitioner's
22  repatriation and as a result cannot give any estimate of when removal might occur. Instead, Respondents asked
23  this Court to subordinate its own decision making power, expressly recognized by the Supreme Court in
24  <u>Zadvydas</u>, to an administrative review to be conducted pursuant to newly enacted INS rules and regulations.

25  Respondents rely upon the Memorandum and Petitioner's interview by Cambodian officials as
26  evidence of his removal. The above argument refutes the former, while failed promises of removal in the past
27  following interviews more than a year ago refutes the latter. <u>See e.g.</u>, <u>Rithy v. INS</u>, 99CV0789-IEG (CGA)
28  (S.D. Cal. Oct. 13, 2000) (Order Granting Petitioner's Motion to Amend Judgment), slip op. at 5 (unpublished

1 opinion) (noting that INS cannot rely on fact of interview to sustain burden of proving ability to remove
2 Cambodian detainee).

3 **E. Respondents Cannot Continue to Detain Petitioner Even If His Repatriation Is Significantly Likely in the Reasonably Foreseeable Future.**

5      Respondents argue that detention beyond the post-removal-period is permissible in certain instances.
6 Respondents state that "the [Supreme] Court held that the INS can continue to detain an alien beyond six
7 months unless the alien establishes good reason to conclude that there is no significant likelihood of removal."
8 See Return at 4. Not surprisingly, Respondents do not quote the majority's opinion. This is because the
9 majority did not conclude that the INS can continue to detain an alien after expiration of the six month removal
10 period. The majority only stated that Respondents "may" continue to detain an alien. Zadvydas, 121 S.Ct at
11 2505. Respondents' discretion to continue to detain an alien is not unlimited.[15]

12      The majority in Zadvydas insisted on a civil commitment standard to determine the lawfulness of
13 continued detention in cases where an alien's removal is significantly likely in the reasonably foreseeable future;
14 continued detention is not automatic. "[I]f removal is reasonably foreseeable, the habeas court should consider
15 the risk of the alien's committing further crimes as a factor potentially justifying confinement within that
16 reasonable removal period." 121 S.Ct at 2504 (emphasis added). Thus, even if an alien's removal from the
17 United States is reasonably foreseeable, Respondents still do not have automatic statutory authority to continue
18 to detain that alien beyond the post-removal-period. Respondents bear the burden of "justifying" the
19 reasonableness of an alien's continued detention beyond the post-removal-period by demonstrating an alien's
20 risk of committing further crimes. Id. The Supreme Court termed Respondents' justification for continued
21 detention only a "potential" and not automatic; thus, a dangerousness determination begins with the
22 presumption that an alien has no potential for committing further crimes and thus cannot be continued in
23 confinement. Id.

24      The alien's risk of committing further crimes should be measured by the civil confinement standard

25 --------

26   [15] Respondents again rely upon an interpretation of the detention statute that the Supreme Court expressly rejected in Zadvydas:

27     The Government points to the statute's word "may." But while "may" suggests discretion, it does not necessarily suggest unlimited discretion. In that respect the word "may" is ambiguous.
28     Indeed, if Congress had meant to authorize long-term detention of unremovable aliens, it certainly could have spoken in clearer terms.

121 S. Ct. at 2502.

espoused by the Supreme Court in <u>Kansas v. Hendricks</u>, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). The Supreme Court in <u>Zadvydas</u> analyzed Respondents' preventive detention justifications proffered for post-removal-period confinement in light of its holding in <u>Hendricks</u>, likening indefinite detention of non-removable aliens to civil confinement. <u>See Zadvydas</u>, 121 S.Ct at 2499. The Court stated that <u>Zadvydas</u>, like <u>Hendricks</u>, involved proceedings that were civil, not criminal, and were non-punitive in purpose and effect. <u>See Zadvydas</u>, 121 S.Ct at 2499. The Court also stated that the duration of an alien's indefinite detention, like civil confinement, "is not limited, but potentially permanent. <u>Id.</u> Where the duration of civil confinement is not limited, but potentially permanent or indefinite, "[the Supreme Court] ha[s] . . . demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger." <u>Id.</u> (citing <u>Hendricks</u>, 521 U.S. at 358, 356). The detention statute does not include this test. Accordingly, the Court in <u>Zadvydas</u> criticized the breadth of 8 U.S.C. § 1231(a)(6), the post-removal-period statute. <u>See Zadvydas</u>, 121 S.Ct at 2499.

> The provision authorizing detention does not apply narrowly to "a small segment of particularly dangerous individuals," <u>Hendricks</u>, supra, at 368, 117 S.Ct. 2072, say suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations. <u>See</u> 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V) (referencing § 1227(a)(1)(C)); <u>cf.</u> <u>Hendricks</u>, 521 U.S., at 357-358, 117 S.Ct. 2072 (only individuals with "past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future" may be detained).

<u>Zadvydas</u>, 121 S.Ct at 2499. Justice Breyer's latter citation to <u>Hendricks</u> prompts a literal comparison of the overly broad indefinite detention provision with a more appropriate civil confinement standard. By doing so, the majority states that the civil confinement standard set forth in <u>Hendricks</u> is the appropriate standard for determining the risk of an alien's committing further crimes. Thus, <u>Zadvydas</u> requires Respondents to demonstrate that an alien's past criminal conduct, coupled with a "present mental condition that creates a likelihood of such conduct in the future," justifies continued confinement.[16] <u>Zadvydas</u>, 121 S.Ct at 2499-2500.

//

//

---

[16] This Court should apply the standard of clear and convincing evidence to determine whether Petitioner suffers from a "harm threatening mental illness" of "present medical condition that creates a likelihood [criminal] conduct in the future." <u>See</u> <u>Zadvydas</u>, 121 S.Ct. at 2499 (citing <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80-83, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).

## CONCLUSION

Respondents cannot continue to detain Petitioner given that Petitioner has provided "good reason" for this Court to believe that his removal from the United States is not "significantly likely" in the reasonably foreseeable future and Respondents failed to rebut this showing. This Court should order Respondents to release Petitioner forthwith from custody.[17]

Respectfully submitted,

Dated: November 22, 2002

JASON I. SER
Attorney
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 234-8467
Attorneys for Petitioner

---

[17] Petitioner refrains from submitting argument in opposition to the INS's claimed power to impose bond as a condition of release given this Court's past decisions concluding that such argument was premature. Petitioner can and will provide such briefing, however, upon such a request by this Court if necessary.

02-cv-1978-J

| | |
|---|---|
| HANG, | ) Case No. 02-cv-1978-J |
| Petitioner, | ) |
| | ) |
| v. | ) PROOF OF SERVICE |
| | ) |
| IMMIGRATION AND NATURALIZATION | ) |
| SERVICE, et. al., | ) |
| | ) |
| Respondents. | ) |
| | ) |

I, the undersigned, say:

1) That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2) That my business address is 225 Broadway, Suite 900, San Diego, California, 92101;

3) That I served the within **TRAVERSE AND EXHIBITS** by placing a true copy of the above-mentioned document in the United States mail on November 22, 2002, to:

> Samuel Bettwy/Robert Plaxico
> Assistant U.S. Attorneys
> 880 Front Street Room 6293
> San Diego, CA 92101-8893

I certify under the laws of the State of California that the foregoing is true and correct. Executed on 22 November 2002 at San Diego, California.

MARIA KUBCZAK

ORIGINAL

1 | JASON I. SER
California Bar. No. 201816
2 | FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
3 | San Diego, California 92101-5008
(619) 234-8467
4

Attorneys for Petitioner

5

6

7

FILED

NOV 2 2 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  (HON. NAPOLEON A. JONES, JR.)

11 | SOPHEA HANG,                     Case No. 02-cv-1978-J (AJB)
   | [A27-747-367],
12
                    Petitioner,
13
   |        v.                       TABLE OF CONTENTS FOR EXHIBITS
14 |                                 PURSUANT TO CIVIL RULE 5.1
   | JOHN D. ASHCROFT, ATTORNEY
15 | GENERAL, UNITED STATES
   | IMMIGRATION AND
16 | NATURALIZATION SERVICE, AND
   | ADELE FASANO, INS DISTRICT
17 | DIRECTOR FOR THE SAN DIEGO
   | DISTRICT,
18
                    Respondents.
19

20 | Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 | Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 | Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23 | Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

24 | Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

25 | Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 | Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

27 | Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 | Exhibit 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26



Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Exhibit 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Exhibit 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Exhibit 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Exhibit 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Exhibit 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Exhibit 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Exhibit 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Exhibit 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Exhibit 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Exhibit 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Exhibit 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Exhibit 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Exhibit 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Exhibit 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Exhibit 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Exhibit 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

02-cv-1524-J

# Exhibit 1

**Detainee Name:** HANG, Sophea      **Date of Birth:** 2/5/1952    **"A" Number:** 27 747 367

**AKAs:** HANG, Kalvin      **BOP Number: None   CDC: None to date.**

**Country of Birth:** Thailand      **Citizenship:** Cambodia

**Date of Arrival:** 12/18/1985      **Place of Arrival:** Los Angeles, CA.

**Manner of Arrival:**      **Last Date into INS Custody:** 3/19/2001

**Entered INS Custody from:**      ☒      **Local, State, or Federal Institution**
                                      ☐      **Other**

**Location: San Diego County Jail**      **Institution Number:  00159876A**
            **Central Division**
            **San Diego, CA**

**Immigration History:**  (Prior INS arrest[s]/parole/bond/custody information)

        Describe:  Admitted into United States as a Refugee on 12/18/1985 at Los Angeles, CA., and adjusted status to that of Lawful Admission as Permanent Resident Alien on 10/27/1987, with such status retroactive to his date of entry.

He was then placed into Removal Proceedings on service of a Notice to Appear (Form I-862), on 3/19/2001.

Additional charges were entered in his case to allege that of an Aggravated Felony, for conviction of a vehicle theft with a sentence of 365-days in jail awarded.

His sentence was then reduced in the theft case to that of 364-days in Jail, and rendered to not be an Aggravated Felony, per definition.

Allegations were modified in his case on filing of an amended NTA with the Immigration Court on 10/1/2001, to charge him with two (2) crimes involving moral turpitude, and one (1) of firearms violation.

On 1/15/2002, the Immigration Judge denied Bond in his case upon application.

On 2/28/2002, the Immigration Judge ordered him Removed/Deported to Cambodia, and denied a cancellation of Removal.  He waived appeal rights of that decision on 2/28/2002.

**2**

**Deportation Officer:** DICKERSON          **Date of Review:**          5/22/2002

**Location Detained:**   Corrections Corporation of America, Inc.
                         San Diego Detention Facility
                         446 Alta Road
                         San Diego, CA., 92143

---

**Deportation/Exclusion/Removal Proceedings**

List all Charges:     ☐     Section 237 (a) (2) , (C) of the INA
                            Section 237 (a) (2) (A) (II) of the INA
                      ☐     Section 212 (a)          ,          ,
                      ☐     Section 241              ,          ,

☒     Under <u>Final Order</u> dated <u>**2/28/2002**</u> by ☒ IJ   ☐ BIA   ☐ Other

☒     Appeal Waived/Appeal Time Elapsed

**Travel Document Status/History:**

**Application was rendered to the Government of Cambodia on 4/4/2002, and is still pending in issuance.**

**The initial application was made prior to the date that the Government of Cambodia implemented the new travel document program, to begin issuing following signing of the agreement to allow for deportation of Cambodian citizens of 3/22/2002.**

**His case is one of an approximate 30-cases being processed at this time for issuance of a Passport or other removal travel document.**

**His removal is deemed to be imminent and impending at this time.**

---

## Legal Representative / Attorney

**G-28 Filed:**   ☐ Yes       ☒ No

**Notification of Interview Made:**   ☐ Yes   ☐ N/A   by:          on:

**Name of Representative / Attorney:**

**Mailing Address:**                **Telephone Number:**

**Present during interview:**          ☐ Yes          ☐ No

**3**

## Criminal History

**Outside the United States**: None determined.
(specify nature of crime, whether convicted, sentence imposed, date, and country)

**In the United States:**      See below listing.

**NCIC Checks:**      ☒ Criminal History Attached      ☐ No record Found
                        (State and Federal)

    Summary of NCIC Checks:   Provided in reverse order to date of conviction, as follows:

**10/16/2000: Convicted in Superior Court, San Diego, CA., under case SCD 155039, for the offense of assault with a deadly weapon, not a firearm, likely to cause great bodily injury,** a Felony, in violation of Section 245A of the California Penal Code, and for which he was sentenced to serve 364-days in County Jail, and placed under 3-years Probation.

**12/7/1999: Convicted in Superior Court, San Diego, CA., under case SCS 142279, for the offense of willfully discharging a Firearm in a Negligent Manner,** a Felony, in violation of Section 246.3 of the California Penal Code, and for which he was sentenced to serve 365 days in County Jail. (later reduced to a sentence of 364 days in County Jail)

**12/7/1999: Convicted in Superior Court, San Diego, CA., under case SCS 142279, for the offense of Vehicle Theft,** in violation of Section 18051A of the California Vehicle Code, a Felony, and for which he was then sentenced to serve 365-days in County Jail (later reduced to 364-days in Jail).

Sentence was modified in the 12/7/1999, cases on 9/18/2000.

The weapons conviction was described in the Police Report provided in his A File as being willfully shooting a semi-automatic handgun 2-4 times outside of a McDonald's Restaurant in a negligent manner, during regular hours of operation of the restaurant, while challenging occupants in the restaurant to a fight. **The offense was committed in furtherance of his activity with the "OBS 50[th] " criminal street gang.** His gang moniker is "Wicked".

## Institutional / Disciplinary Record

**Did the detainee have prior Disciplinary Reports?** ☐ Yes ☒ No

    If Yes, List & Describe:

    Source:

**Disciplinary reports and Incidents while in INS Custody?** ☐ Yes ☒ No

    If Yes, List & Describe:

## Specifics of Interview

**Date of File Review:**    5/22/2002

**Date of Detainee Interview: N/A**

**Does the detainee have a place to live in the United States?** ☒ Yes ☐ No

    Address:    5049 Auburn Drive
                 San Diego, CA 92105

    Telephone: 619-702-2839

**Is the detainee subject to any parole or probation requirements?** ☒ Yes ☐ No

    Describe:    Remains on three (3) years Probation under case SCD 155039, on conviction of 10/16/2000.

**Does the detainee have close family ties within the United States?** ☒ Yes ☐ No

    Describe:    Mother, father & siblings at above address.

**Does the detainee have any community ties or non-governmental sponsors?**

                 ☒ Yes ☐ No

    Describe:    His parents offer sponsorship upon his release. The family exists on Food stamps, AFDC, Medical and SSI payments.

**Does the detainee have any employment prospects?**  ☒ Yes   ☐ No

Describe:     He provides that he can start to work at:

Pacific Systems Furniture
5995 Pacific Mesa CT, Suite 108
Mira Mesa, CA  92126

Telephone:  Sam Bedoy, (858) 552 8812 for verification.

**What is the detainee's employment history?**

Describe:     Telemarketing;  Sales and furniture repair.

**What is the detainee's educational level?**

Describe:  His File noted GED completed, with some college classes attended.

**Does the detainee have any vocational training?**

Describe:  None denoted in A File.

---

## Medical/Psychological Concerns

**Medical/Psychological Report / Summary:**   ☐ Attached  ☒ None  ☐ Not Available

**Date and Source:**

---

**Other documentary evidence for consideration in this review:**

He provided a hand-written letter for incorporation into his Custody Review at this time, dated 5/6/2002.

He admits culpability for his crimes, and petitions the District Director for a release from custody until such time as he is deported to Cambodia.  He provided the name and contact information for return to a prior employer upon his release.



**6**

## Discussion at Interview

Notes: No interview was conducted in this case.

---

The INS detainee was found ☐ **CREDIBLE**　　☐ **NOT CREDIBLE**

**Explain:**

Credibility was not assessed.

---

## Officer Comments/Analysis & Recommendation

This case involves a citizen of Cambodia, with a Final Order date of 2/28/2002. The normal Removal Period is 90-days from the date of Final Order. He will achieve that date on 5/28/2002.

The Government of Cambodia on 3/22/2002, signed an agreement with the Government of the United States to allow deportation of criminal aliens to Cambodia. The Government of Cambodia instituted a program to begin issuing travel or other documents to allow for repatriation of Cambodian citizens on about 4/20/2002, and are at this time reviewing the travel document applications for those citizens who are currently in custody of the INS.

In accord with Rules an Regulations as published on 12/21/2000, and on 11/14/2001, a period of 180-days was noted to be a reasonable period in which to seek to obtain a travel document, after which each case would be assessed on it's merits for consideration as to whether or not a travel document could be anticipated to be issued within the reasonably foreseeable future.

In this case, there is cause to believe that such a document will be issued within the six-month (180-day) "reasonable period" as provided by Rules and Regulations.

HANG has a substantial criminal history, which involves shooting a firearm at persons while participating in Gang related activities, and for two Felony theft's of personal property.

He has served approximately ½ of the sentence imposed in his criminal cases to date.

His parents are supported by one child, his sister, and would not be able to provide substantial monies for his support upon his release.

In mitigation, he provided that he feels remorse for his criminal actions, and believes that he has rehabilitated himself during his periods of incarceration. He claims that he no longer associates with the members of the criminal street Gang he was a member of.

He provided that he has employment waiting upon his release, and states a desire to go to school and to become a productive member of his community if released.

He has not engaged in any civil uprising or assaults while incarcerated with the County authorities or with INS to date.

His criminal history does not appear to be ascending with regard to degree of seriousness or in nature, with regard of physical violence.

He appears to have strong family support for his release from custody in the even that no travel document is forthcoming from the Government of Cambodia.

In review of this A File, factors as noted in 8 C.F.R. Section 241.4(e) and (f) were assessed, at a minimum.

His application for travel documents is at this time under consideration by the Consul General of Cambodia, and has been referred to Headquarter INS OPS/Travel Document Unit for tracking and assistance.

I recommend that he be continued in custody during the interim that a travel document application is pending. It is at this time perceived to be imminent and impending in issuance to allow for his removal to Cambodia.


File Review Officer                         Date:

Reviewed by:                                Date:

# DISTRICT DIRECTOR'S CUSTODY DETERMINATION

☐     RELEASE FROM CUSTODY / ORDER OF SUPERVISION

☐     RELEASE FROM CUSTODY / ORDER OF SUPERVISION UNDER BOND

        Bond Amount: _____

☑     CONTINUE IN CUSTODY / SCHEDULE FOR REVIEW IN SIX MONTHS

Comments (attach additional sheet(s) if necessary):



INS District Office:        San Diego, CA

Signature of District Director: _____ Date _____

(Final 12/21/2000)

9

Exhibit 2

IMMIGRATION COURT
401 WEST A STREET, SUITE 800
SAN DIEGO, CA 92101-7904

In the Matter of

MOHS, SOPHEA
Respondent

Case No.: A27-747-867

IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on Feb 28, 2002.
This memorandum is solely for the convenience of the parties. If the
proceedings should be appealed or reopened, the oral decision will become
the official opinion in the case.

[X] The respondent was ordered removed from the United States to _____
or in the alternative to __

[ ] Respondent's application for voluntary departure was denied and
respondent was ordered removed to
alternative to

[ ] Respondent's application for voluntary departure was granted until
_____ upon posting a bond in the amount of $ _____
with an alternate order of removal to

[ ] Respondent's application for asylum was ( )granted ( )denied
( )withdrawn.

[ ] Respondent's application for withholding of removal was ( )granted
( )denied ( )withdrawn.

[X] Respondent's application for cancellation of removal under section
240A(a) was ( )granted (X)denied ( )withdrawn.

[ ] Respondent's application for cancellation of removal was ( ) granted
under section 240A(b)(1) ( ) granted under section 240A(b)(2)
( ) denied ( ) withdrawn. If granted, it was ordered that the
respondent be issued all appropriate documents necessary to give
effect to this order.

[ ] Respondent's application for a waiver under section _____ of the INA was
( )granted ( )denied ( )withdrawn or ( )other.

[ ] Respondent's application for adjustment of status under section _____
of the INA was ( )granted ( )denied ( )withdrawn. If granted, it
was ordered that respondent be issued all appropriate documents necessary
to give effect to this order.

[ ] Respondent's status was rescinded under section 246.

[ ] Respondent is admitted to the United States as a _____ until

[ ] As a condition of admission, respondent is to post a $ _____ bond.

[ ] Respondent knowingly filed a frivolous asylum application after proper
notice.

[ ] Respondent was advised of the limitation on discretionary relief for
failure to appear as ordered in the Immigration Judge's oral decision.

[ ] Proceedings were terminated.

[ ] Other:

Date: Feb. 28, 2002
Appeal: Waived/Reserved    Appeal Due By:
by both parties

JOSEPH M. REEVES
Immigration Judge

Exhibit 3

**12**



**U.S. Department of Justice**

Immigration and Naturalization Service

_District Director_

_880 Front Street, Suite 1234_
_San Diego, CA 92101-8834_

March 5, 2002

**A27 747 367**
**Hang, Sophea**

Consul General
Royal Embassy of Cambodia
4500 16th Street, NW
Washington, D.C. 20011
(202) 726-7742

Dear Sir:

Please issue a travel document for the above individual, so we may his effect deportation to Cambodia.

For the above named individual, please find photographs, Form I-217, Form I-213, order of removal, Form I-862 and conviction documents. Please call (619) 557-7887 if you wish to arrange for an interview.

Thank you for your prompt response to the above request. Your assistance in this matter is greatly appreciated.

Sincerely yours,

Jim Dickerson
Deportation Officer

Enclosures

13

# Exhibit 4



# KINGDOM OF CAMBODIA

NATION - RELIGION - KING

Royal Embassy of Cambodia
to the United States of America
Washington, D.C.

Mar 06, 02

Jim Dickerson
Deportation Officer
880 Front Street, Suite 1234
San Diego, CA 92101-8834

**RE:** **A27 747 367**
**Hang, Sophea**

Dear Sir / Madam:

I have the honor to acknowledge receipt of your letter dated Mar 05, 2002, regarding the deportation and the issuance of a travel document for the above mentioned individual.

The Government of the United States of America and the Royal Government of Cambodia have not yet signed the agreement on the deportation and the return of former Cambodian Citizens to Cambodia. Therefore, the Royal Embassy of Cambodia is not authorized to issue all of travel documentation for him pending the agreement reached between the two countries.

Please accept, the assurances of my highest consideration.

Sincerely,

Ly Touch
Second Secretary and Consul

CC: Ministry of Foreign Affairs and International Cooperation

4500 16th Street, N.W.
Washington, D.C. 20011

www.embassy.org/cambodia
cambodia@embassy.org

Tel: (202) 726 74
Fax: (202) 726 381

Exhibit 5



**U.S. Department of Justice**
Immigration and Naturalization Service



SND 50/14.2

---

*District Director*
*Detention and Removal Operations*

*880 Front Street, Suite 2242*
*San Diego, CA 92101*

Consulate of Cambodia
4500 16th Street N.W.
Washington, D.C. 20011
(202) 726-7742

April 4, 2002

RE:    Sophea HANG
CASE: A27 747 367

Dear Consul General;

Please issue a travel document for the above named individual so that we may effect his Removal to Cambodia as ordered by the Immigration Judge on February 28, 2002. He is in custody of the Immigration Service pending receipt of a travel document with which to depart the United States.

Sophea HANG is a citizen of Cambodia, who was born on February 25, 1981, in a transitional camp at Chanthabuiri, Kampot, Thailand to parents who are citizens and nationals of Cambodia.

A review of his U.S. Immigration records reflected that his father, Phoeun HANG was born on February 5, 1952, in Compong Spue, Cambodia to parents known as Nim HANG and Liv DOL, who were also citizens of Cambodia. His mother, Hoeung Chhun KHENG was born in Kampong Thom, Cambodia, on January 5, 1956, to parents known as Ban Heng CHEAM and Chi Hop HAP, who were also citizens and nationals of Cambodia. The parents of Sophea HANG were married in January 1975. His parents departed Cambodia in March, 1980.

Further, it was indicated in his Court records that he currently has relatives who continue to reside in Cambodia, reflected to consist of approximately 20 cousins, multiple aunts and uncles, and that both of his maternal Grandparents still live in Cambodia.

Please call (619) 230-7208 to schedule a telephonic interview if you desire to conduct such an interview.

An application for a removal travel document was made to your office on March 5, 2002, prior to the Government of Cambodia entering into an agreement on March 22, 2002, with the United States to allow for the deportation and return of former Cambodian Citizens to Cambodia.

If I can assist you in any further manner to facilitate issuance of a travel document for Mr. HANG, please contact me.

Thank you,

James K. Dickerson
Deportation Officer
(619) 557 6383

Attachments

**UNITED STATES DEPARTMENT OF JUSTICE**
IMMIGRATION & NATURALIZATION SERVICE

**James K. Dickerson**
Deportation Officer

880 Front St., Suite 2242
San Diego, CA 92101

Telephone: (619) 557 6117
Fax:        (619) 557 5399

17

Exhibit 6

# MEMORANDUM TO FILE

DATE: 4/8/2002

RE: HANG

A NUMBER: 27747367

OFFICER: Dingerian,

NATURE OF INFORMATION/CONTACT:

Cambodian Consul General
Mr. Ly Touch (Pram' Tooch)
Replaces HK Noh —

Tryd As of 4/8/02 - no Answer yet —

Will hold the TO Pracerdc/ he Gets
Official word.

Exhibit 7

MEMORANDUM BETWEEN THE GOVERNMENT OF THE UNITED STATES
AND THE ROYAL GOVERNMENT OF CAMBODIA FOR THE
ESTABLISHMENT AND OPERATION OF
A UNITED STATES-CAMBODIA JOINT COMMISSION
ON REPATRIATION

The Government of the United States of America (United States) and the Royal Government of Cambodia (Cambodia):

Recognizing their mutual international obligations to accept the return of their nationals in an orderly, prompt, and humane manner;

Desiring to establish and advance the development of normal immigration relations, in accordance with general recognized principles of international law and practice;

Desiring to put into effect the principles adopted by both States in the Joint Statement made in Phnom Penh on April 27, 2000, and subsequently endorsed by order of the Royal Government of Cambodia on June 21, 2000; and

Desiring to further enhance cooperative and friendly relations between the two States on the basis of respect for each State's sovereignty, and on the basis of equality and mutual interest;

Hereby establish the following Principles and Objectives which are intended to govern the establishment and operation of a Joint Commission on Repatriation:

### Fundamental Principles

1. Each repatriation request should be considered and decided individually, on a case-by-case basis, without preconditions.

2. The United States and Cambodia should act in a spirit of mutual cooperation in determining the nationality of an individual and in all other matters pertaining to repatriation.

3. The United States and Cambodia are committed to the primary objective of effecting the return of each other's nationals to their home State, taking into account the humanitarian and compassionate aspects of each case and the principles of internationally recognized human rights.

**21**

## Composition of the Joint Commission and Scheduling of Meetings

1. The Joint Commission on Repatriation (Commission) should be comprised of four (4) members from the United States and four (4) from Cambodia, representing the ministries of immigration, foreign affairs, and justice, or their equivalent, of such State.

2. The Commission should meet twice each year, or as mutually agreed, at times and locations to be mutually determined.

## Procedures/Modalities for Considering Repatriation Requests

1. Each State should designate a Central Authority for the receipt and initial screening of repatriation requests and related matters.

2. The Commission should be the primary forum for the discussion and resolution of repatriation policy and individual repatriation requests refused by the Central Authority of the requested State.

3. Unless otherwise agreed, all repatriation requests shall be initially sent to the Central Authority of the requested State and should include:

   a. a copy of the final order of removal issued by the competent authority of the requesting State;
   b. a copy of the individual's passport, if available, or other documentation evidencing the identity and biographical history of the individual and his or her status as a national of the receiving State;
   c. a copy, if any, of any available record of the individual's criminal violations in the requesting State;
   d. two identical photographs of the individual and his or her fingerprints and medical history, if available;
   e. any additional information that the Central Authority of the requested State deems necessary.

4. Upon receiving and reviewing a repatriation request, the Central Authority of the requested State may request the assistance and resources of the Central Authority of the requesting State in conducting any additional interview of the individual and verifying any information contained in the request.

5. The Central Authority of the requested State should respond in writing to the Central Authority of the requesting State not later than 30 days from the date of receipt of the request, unless otherwise agreed. In all cases of refusal, the Central Authority of the

22

requested State should state its reasons in writing and should refer the request to the Commission for consideration. The Commission shall consider all referred requests at its next scheduled meeting.

6. When the Central Authority of the requested State accepts a repatriation request, it should simultaneously issue a travel document, valid for at least 60 days, to permit the individual's return. The requesting State should expeditiously make the appropriate arrangements for the return of the individual to the requested State, and should inform the Central Authority of the requested State at least seven (7) business days in advance of the return itinerary and any special considerations, such as medical, law enforcement, or escort matters.

7. Unless otherwise agreed, all costs of repatriation, including air transportation and escort services, should be borne exclusively by the requesting State.

Signed at Phnom Penh on March 22, 2002, in duplicate, in both the English and Khmer languages with identical value.

FOR THE GOVERNMENT OF THE        FOR THE ROYAL GOVERNMENT
UNITED STATES OF AMERICA          OF CAMBODIA

Kent M. Wiedemann               Lt. Gen. Em Sam An
Ambassador of the                  Secretary of State
United States of America           Ministry of Interior

**23**

# Exhibit 8

| DATE PREPARED<br>March 5, 2002 | **INFORMATION FOR TRAVEL DOCUMENT OR PASSPORT** | FILE<br>A27 747 367 |
|---|---|---|

| 1. NAME<br>Hang, Sophea | | 2. SEX<br>MALE |
|---|---|---|
| 3. OTHER NAMES USED OR KNOWN BY | | 4. CITIZENSHIP<br>Cambodia |

| 5. DATE OF BIRTH<br>02/25/81 | 6. PLACE OF BIRTH<br>Kampot, Thailand |
|---|---|

| 7. HEIGHT<br>5'6" | WEIGHT<br>160lbs | EYES<br>Brn | HAIR<br>Blk | COMPLEXION<br>Medium | MARKS OR SCARS<br>Left hand amputated: tattoos on right arm |
|---|---|---|---|---|---|

| 8. NEAREST LARGE CITY TO PLACE OF BIRTH | 9. DISTANCE AND DIRECTION OF PLACE OF BIRTH FROM THIS LARGE CITY |
|---|---|

**10.** IF CITIZENSHIP IS DIFFERENT FROM COUNTRY OF BIRTH, EXPLAIN. IF NATURALIZED IN ANY COUNTRY, SHOW DATE AND PLACE OF NATURALIZATION, CERTIFICATE NUMBER, AND STATE HOW CITIZENSHIP WAS ACQUIRED.

| 11. NAMES; LOCATIONS AND DATES (YEARS) OF ATTENDANCE OF FOREIGN SCHOOLS | 12. NAMES, EXACT LOCATIONS AND DATES (YEARS) OF ATTENDANCE OF FOREIGN CHURCHES. INCLUDE DATE AND NATURE OF ANY RELIGIOUS CEREMONY WHICH MAY HAVE BEEN RECORDED.<br>N/A |
|---|---|

**13.** LAST PERMANENT RESIDENCE IN COUNTRY OF CITIZENSHIP *(Show dates of residence)*
Unknown

**14.** ADDRESS IN COUNTRY OF LAST FOREIGN RESIDENCE *(Show dates of residence, and Immigration status there)*
2842 Broadway, San Diego, CA

| 15. PLACE OF ENTRY INTO UNITED STATES<br>Los Angeles, CA | DATE OF ENTRY INTO UNITED STATES<br>12/18/85 |
|---|---|

**16.** LIST DATE AND PLACE OF ISSUANCE AND NUMBER OF PASSPORT, BIRTH CERTIFICATE, BAPTISMAL CERTIFICATE OR DOCUMENT OF IDENTITY. SPECIFY DATES OF MILITARY SERVICE, COUNTRY AND UNIT, RANK, SERIAL NUMBER, AND PLACES OF INDUCTION AND DISCHARGE.
refugee

**17.** IN POSSESSION OF TRAVEL DOCUMENT OR PASSPORT AT TIME OF ENTRY? ☐ YES ☐ NO. DESCRIBE DOCUMENT (S). IF SUBJECT DID NOT HAVE TRAVEL DOCUMENT OR PASSPORT AT TIME OF ENTRY, OR DOES NOT HAVE SUCH A DOCUMENT NOW, INDICATE WHETHER EVER OBTAINED ONE: ☐ YES ☐ NO. STATE HOW, WHEN, AND WHERE IT WAS OBTAINED: WHAT KIND OF DOCUMENT IT WAS, AND WHAT BECAME OF IT.

| 18. FATHER'S NAME<br>Hang, Phoeun | DATE OF BIRTH<br>05/02/52 | PLACE OF BIRTH<br>Cambodia |
|---|---|---|
| PRESENT ADDRESS<br>2842 Broadway, San Diego, CA | | |

| 19. MOTHER'S MAIDEN NAME<br>Kheng, Hoeun | DATE OF BIRTH<br>05/01/56 | PLACE OF BIRTH<br>Cambodia |
|---|---|---|
| PRESENT ADDRESS<br>2842 Broadway, San Diego, CA | | |

**20.** NAME, RELATIONSHIP, AND ADDRESSES OF RELATIVES ABROAD
unknown

**21.** PREVIOUSLY ☐ EXCLUDED ☐ DEPORTED ☐ REQUIRED TO DEPART FROM THE UNITED STATES

| ON | N/A<br>*(Date)* | VIA | N/A<br>*(Port)* | TO | N/A<br>*(Country)* |
|---|---|---|---|---|---|

**22.** INDICATE WHETHER EVER ARRESTED, IN PRISON OR A PUBLIC INSTITUTION IN THE COUNTRY OF WHICH A NATIONAL, SUBJECT OR CITIZEN: ☐ YES ☒ NO, IF SO, GIVE DATES AND PLACES

**23.** NAME, NATIONALITY AND PRESENT ADDRESS OF SPOUSE, AND DATE AND PLACE OF MARRIAGE

**24.** NAMES, AGES AND ADDRESSES OF ALL CHILDREN
Claims non

**25.** IF NONCANADIAN DEPORTABLE TO CANADA, GIVE DATE AND PORT OF ARRIVAL IN CANADA, AND NAME OF VESSEL
N/A

Form I-217 (Rev. 3-30-77)Y  UNITED STATES DEPARTMENT OF JUSTICE Immigration and Naturalization Service

**25**

Exhibit 9

**LY TOUCH**

**C/O Royal Embassy of Cambodia**

**4500 16ᵗʰ Street, N.W.**

**Washington, DC.**

**20011**

Hang, Sophea
A#27 747 367
D-N 102
P.O. BOX 439049
San Ysidro, Ca.
92143-9049

June 28, 2002

Dear Madam:

   I am writing this letter to request "travel documents" per the United States Immigration And Naturalization Services orders. I am presently being detained in an I.N.S. facility for removal proceedings based on my criminal record and subsequent sentences. I was born in Thailand and I am a citizen of Cambodia. I would greatly appreciate a written answer to my request so that I can show the I.N.S. that I am fulfilling my commitment in the research as per ordered so by my deportation officer. I thank you for your prompt attention in this matter.

                                        Sincerely,


                                        Hang, Sophea

27

Hang Sophea
A# 27747367
C-K 107
P.O. BOX 439049
San Ysidro, Ca.
92143-9049

92101+22237 37

James Dickerson, D.O.
C/O U.S. Department of Justice
I.N.S. District Director
880 Front Street, Room 2242
San Diego, Ca.
92101



# Exhibit 10

Dear Mr. Dickerson,

Please send this letter to the Cambodian Embassy for me. Thank you.

Sincerely,

Sophea Hang

Exhibit 11



**U.S. Department of Justice**
Immigration and Naturalization Service

# ORIGINAL

HQPDU
*Washington, DC 20536*

A27 747 367

Sophea HANG
C/o CCA
446 Alta Rd. #5400
P.O. Box 439049
San Diego, CA. 92143

## Decision to Continue Detention

This letter is to inform you that your custody status has been reviewed and it has been determined that you will not be released from the custody of the Immigration and Naturalization Service (INS) at this time. This decision has been made based on a review of your file and/or your personal interview and any consideration of the information submitted to INS' reviewing officials in support of your application for release.

You are a citizen of Cambodia. You were admitted to the United States as a refugee on Dec. 18, 1985 and subsequently adjusted your status to that of a lawful permanent resident. You have been convicted of assault with a deadly weapon, discharging a firearm in a negligent manner and vehicle theft. In Feb. 2002, you were ordered removed from the country and no appeal was filed in your case.

Title 8 CFR 241.4(e) enumerates the criteria for the release of an alien after having received a final order of removal. Among the criteria listed are: that travel documents are not available; presently non-violent; likely to remain non-violent; the person does not pose a threat and do not pose a flight risk.

Removals of Cambodian citizens have resumed with increasing frequency. There is a strong possibility that a travel document will be available for your removal in the reasonably foreseeable future. Your criminal record is violent in nature and there is nothing in your file that shows that you would remain non-violent and not pose a threat to the community.

The INS will conduct another review of your custody status within one year of the date of this notice. It is in your best interest to maintain proper behavior while awaiting this review. If you have any questions please contact your case officer.

You may submit evidence to the contrary. You may send this evidence to the Headquarters Post Order Unit (HQPDU), 801 I St, NW, Washington, DC 20536, Room 800.

_____
Signature of HQPDU Director/Designated Representative

AUG -3 2002
_____
Date

**32**

---

## PROOF OF SERVICE

**(1)**    **Personal Service (Officer to complete both (a) and (b) below.)**

(a)    I _Glen Berl_ _VLS_ , _Deportation Office_ ,

Name of INS Officer            Title

certify that I served _Sophea Hang_ with a copy of

Name of detainee

this document at _C.C.A_ on _8/13/03_ , at _1330_

Institution         Date         Time

(b)    I certify that I served the custodian _____ ,

Name of Official

_____ , at _____ , on

Title           Institution

_____ with a copy of this document.

Date

<strong>OR</strong>

**(2)**    **Service by certified mail, return receipt. (Attach copy of receipt)**

I _____ , _____ , certify

Name of INS Officer           Title

that I served _____ and the custodian _____

Name of detainee           Name of Official

with a copy of this document by certified mail at _____ on _____ .

Institution         Date

( ) cc: Attorney of Record or Designated Representative
( ) cc: A-File

**33**

Exhibit 12

JASON I. SER
California Bar. No. 201816
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008
(619) 234-8467

Attorneys for Petitioner

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## (HON. NAPOLEON A. JONES, JR.)

| | |
|---|---|
| KININE KIM, [A25-289-140], Petitioner, v. JOHN D. ASHCROFT, ATTORNEY GENERAL, UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, AND ADELE FASANO, INS DISTRICT DIRECTOR FOR THE SAN DIEGO DISTRICT, Respondents. | Case No. 02-cv-1524-J (LAB) |

I, Kinine Kim, do hereby declare under penalty of perjury as follows:

1. I am a detainee currently residing at the INS's detention facility operated by Corrections Corporation of America ("CCA") in San Diego, California.

2. The facts in this declaration are based upon my recollection of the interview that occurred at CCA as well as notes taken by my attorney detailing our conversation immediately after the interview during which I described the questions posed by the Cambodian officials and answers I gave i̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶

3. Two officials from the government of Cambodia conducted the interview at C

**35**

4. They asked me the following questions:

    a. name;

    b. date of birth;

    c. where I was born;

    d. where my family was born;

    e. whether I had any family in Cambodia;

    f. how much family I had in the United States;

    g. how long I and my family have been in the United States;

    h. what languages I spoke;

    i. whether I had a criminal history;

    j. what offenses I committed;

    k. if my parents recently traveled to Cambodia;

    l. whether I had a place to live if I returned to Cambodia.

5. I informed these officials of my name and date of birth.

6. I informed these officials that I was born in a refugee camp in Thailand.

7. I informed these officials that I was not aware of any family members still residing in Cambodia.

8. I informed these officials that any remaining family that had been in Cambodia was killed during the Killing Fields executions.

9. I informed these officials that my entire family now resides in the United States.

10. I informed these officials that I entered the United States in 1981 with my family.

11. I informed these officials that I spoke only English. ʿUNDERSTOOD VERY LITTLE CAM

12. I informed these officials that I did not speak any languages native to Cambodia.

13. I informed these officials of my criminal history.

//

//

//

**36**

14.     I informed these officials that my parents have not recently traveled to Cambodia.

15.     I informed these officials that I did not have a place to live if I returned to Cambodia.

16.     These officials informed me that I would not likely receive a travel document due to my background, including my birth in Thailand.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of November, 2002, in San Diego, California.


_____
Kinine Kim

02-cv-1524-.

37

Exhibit 13

# FEDERAL DEFENDERS OF SAN DIEGO, INC.

The Federal Community
Defender Organization
for the Southern
District of California

October 17, 2002

Glen Beck                                    Via: Mail and Facsimile
Deportation Officer
Immigration and Naturalization Service
Otay Mesa Detention Facility
446 Alta Road, Suite 5400
San Diego, CA 92158

   Re:   <u>Sophea Hang  A27-747-367</u>

Dear Mr. Beck:

   I am writing to you regarding the detention of the above named detainee at your detention facility in the San Diego District of the INS. As you are aware, Mr. Hang entered INS custody on March 19, 2001 and was ordered deported by an immigration judge on February 28, 2002. This order was final that same day given Mr. Hang's waiver of appeal. The waiver of appeal commenced the 180-day statutory removal period on February 28, 2002, as set forth by the Supreme Court in <u>Zadvydas v. Davis</u>. On August 27, 2002, the 180-day removal period expired. However, Mr. Hang remains in detention despite the fact that, as the INS has conceded, the government of Cambodia refused to issue a travel document that would permit the Service to effectuate his removal to that country. As per the decision in <u>Zadvydas v. Davis</u>, he must be released at once.

   Mr. Hang will briefly set forth the evidence demonstrating that his removal to Cambodia is not significantly likely in the reasonably foreseeable future. First, the post-order custody review worksheets, attached hereto and labeled attachment A, do not indicate that the government of Cambodia intends to issue a travel document. Although the worksheets state that the Cambodian government is considering the INS's application, the government of Cambodia expressly denied a travel document on May 6, 2002. This letter is contained in his A-File, which is in custody of the INS in the San Diego District. Accordingly, the Service has been on notice that no document will be forthcoming. The denial is attached as attachment B. The government of Cambodia has declined and expressly refused to issue travel documents to other similarly situated Cambodian nationals. One such letter is attached as attachment C. These refusals, as in this case, occurred subsequent to completion of the agreement signed between that government and the United States, which negate the position that the agreement will automatically result in removals of all Cambodian nationals.

   Furthermore, the same custody review worksheets indicate that assistance in the acquisition of travel documents had been made to INS Headquarters. According to 8 C.F.R. § 241.4, subsection (g), entitled travel documents and docket control for aliens continued in detention beyond the removal period, such a request is only made where "the district director is <u>unable</u> to secure travel documents within the removal period." Thus, it is fair to conclude that the INS knows and acknowledges its inability to effect removal in the foreseeable future of Mr. Hang, despite his willingness to cooperate, and even assist, in efforts to obtain a travel document.

Home Savings Tower
225 Broadway
Suite 900
San Diego,
California
92101-5008
(619) 234-8467
FAX (619) 687-2666

**39**

The Service cannot doubt Mr. Hang's complete willingness to assist in his repatriation and cooperate in any manner required. In a letter dated June 28, 2002, Mr. Hang himself wrote the government of Cambodia and requested that it issue a travel document permitting him to be deported to that country. This letter, attached as attachment D, proves that Mr. Hang has been cooperative with INS efforts to secure a travel document and has not sought to impede his removal.

Mr. Hang cannot be removed in the reasonably foreseeable future. The INS must abide by the Supreme Court's decision in <u>Zadvydas v. Davis</u>, which militates for Mr. Hang's immediate release from detention. If you have any questions or concerns regarding this matter, please do not hesitate to contact my office.

Very truly yours,

Jason I. Ser
Attorney

**40**

Attachment A

**Detainee Name:** HANG, Sophea  **Date of Birth:** 2/5/1952  **"A" Number:** 27 747 367

**AKAs:** HANG, Kalvin  **BOP Number:** None  **CDC:** None to date.

**Country of Birth:** Thailand  **Citizenship:** Cambodia

**Date of Arrival:** 12/18/1985  **Place of Arrival:** Los Angeles, CA.

**Manner of Arrival:**  **Last Date into INS Custody:** 3/19/2001

**Entered INS Custody from:**  ☒ **Local, State, or Federal Institution**
☐ **Other**

**Location:** San Diego County Jail  **Institution Number:** 00159876A
Central Division
San Diego, CA

**Immigration History:** (Prior INS arrest[s]/parole/bond/custody information)

Describe: Admitted into United States as a Refugee on 12/18/1985 at Los Angeles, CA., and adjusted status to that of Lawful Admission as Permanent Resident Alien on 10/27/1987, with such status retroactive to his date of entry.

He was then placed into Removal Proceedings on service of a Notice to Appear (Form I-862), on 3/19/2001.

Additional charges were entered in his case to allege that of an Aggravated Felony, for conviction of a vehicle theft with a sentence of 365-days in jail awarded.

His sentence was then reduced in the theft case to that of 364-days in Jail, and rendered to not be an Aggravated Felony, per definition.

Allegations were modified in his case on filing of an amended NTA with the Immigration Court on 10/1/2001, to charge him with two (2) crimes involving moral turpitude, and one (1) of firearms violation.

On 1/15/2002, the Immigration Judge denied Bond in his case upon application.

On 2/28/2002, the Immigration Judge ordered him Removed/Deported to Cambodia, and denied a cancellation of Removal. He waived appeal rights of that decision on 2/28/2002.

**42**

Deportation Officer: DICKERSON                Date of Review:    5/22/2002

Location Detained:   Corrections Corporation of America, Inc.
                     San Diego Detention Facility
                     446 Alta Road
                     San Diego, CA., 92143

---

**Deportation/Exclusion/Removal Proceedings**

List all Charges:     ☐   Section 237 (a)  (2) , (C) of the INA
                          Section 237 (a)  (2)  (A)  (II)  of the INA
                      ☐   Section 212 (a)              ,        ,
                      ☐   Section 241                  ,        ,

☒   Under <u>Final Order</u> dated <u>2/28/2002</u>  by ☒ IJ  ☐ BIA  ☐ Other

☒   Appeal Waived/Appeal Time Elapsed

**Travel Document Status/History:**

Application was rendered to the Government of Cambodia on 4/4/2002, and is still pending in issuance.

The initial application was made prior to the date that the Government of Cambodia implemented the new travel document program, to begin issuing following signing of the agreement to allow for deportation of Cambodian citizens of 3/22/2002.

His case is one of an approximate 30-cases being processed at this time for issuance of a Passport or other removal travel document.

His removal is deemed to be imminent and impending at this time.

---

## Legal Representative / Attorney

G-28 Filed:    ☐ Yes      ☒ No

Notification of Interview Made:    ☐ Yes    ☐ N/A    by:        on:

Name of Representative / Attorney:

Mailing Address:              Telephone Number:

Present during interview:        ☐ Yes    ☐ No

**43**

## Criminal History

**Outside the United States:**   None determined.
(specify nature of crime, whether convicted, sentence imposed, date, and country)

**In the United States:**   See below listing.

**NCIC Checks:**   ☒ Criminal History Attached          ☐ No record Found
(State and Federal)

Summary of NCIC Checks:   Provided in reverse order to date of conviction, as follows:

**10/16/2000:  Convicted in Superior Court, San Diego, CA., under case SCD 155039, for the offense of assault with a deadly weapon, not a firearm, likely to cause great bodily injury, a** Felony, in violation of Section 245A of the California Penal Code, and for which he was sentenced to serve 364-days in County Jail, and placed under 3-years Probation.

**12/7/1999:  Convicted in Superior Court, San Diego, CA., under case SCS 142279, for the offense of willfully discharging a Firearm in a Negligent Manner, a Felony,** in violation of Section 246.3 of the California Penal Code, and for which he was sentenced to serve 365 days in County Jail. (later reduced to a sentence of 364 days in County Jail)

**12/7/1999:  Convicted in Superior Court, San Diego, CA., under case SCS 142279, for the offense of Vehicle Theft,** in violation of Section 18051A of the California Vehicle Code, a Felony, and for which he was then sentenced to serve 365-days in County Jail (later reduced to 364-days in Jail).

Sentence was modified in the 12/7/1999, cases on 9/18/2000.

The weapons conviction was described in the Police Report provided in his A File as being willfully shooting a semi-automatic handgun 2-4 times outside of a McDonald's Restaurant in a negligent manner, during regular hours of operation of the restaurant, while challenging occupants in the restaurant to a fight.  **The offense was committed in furtherance of his activity with the "OBS 50th " criminal street gang.**  His gang moniker is "Wicked".

## Institutional / Disciplinary Record

Did the detainee have prior Disciplinary Reports?  ☐ Yes  ☒ No

    If Yes, List & Describe:

    Source:

Disciplinary reports and Incidents while in INS Custody?  ☐ Yes  ☒ No

    If Yes, List & Describe:

## Specifics of Interview

Date of File Review:　　5/22/2002

Date of Detainee Interview: N/A

Does the detainee have a place to live in the United States?  ☒ Yes  ☐ No

    Address:　　5049 Auburn Drive
               San Diego, CA  92105

    Telephone: 619-702-2839

Is the detainee subject to any parole or probation requirements?  ☒ Yes  ☐ No

    Describe:　　Remains on three (3) years Probation under case SCD 155039, on conviction of 10/16/2000.

Does the detainee have close family ties within the United States?  ☒ Yes  ☐ No

    Describe:　　Mother, father & siblings at above address.

Does the detainee have any community ties or non-governmental sponsors?

        ☒ Yes  ☐ No

    Describe:　　His parents offer sponsorship upon his release.  The family exists on Food stamps, AFDC, Medical and SSI payments.

Does the detainee have any employment prospects?  ☒ Yes  ☐ No

Describe:    He provides that he can start to work at:

Pacific Systems Furniture
5995 Pacific Mesa CT, Suite 108
Mira Mesa, CA  92126

Telephone:  Sam Bedoy, (858) 552 8812 for verification.

What is the detainee's employment history?

Describe:    Telemarketing;  Sales and furniture repair.

What is the detainee's educational level?

Describe:  His File noted GED completed, with some college classes attended.

Does the detainee have any vocational training?

Describe:  None denoted in A File.

---

## Medical/Psychological Concerns

Medical/Psychological Report / Summary:  ☐ Attached  ☒ None  ☐ Not Available

Date and Source:

---

Other documentary evidence for consideration in this review:

He provided a hand-written letter for incorporation into his Custody Review at this time, dated 5/6/2002.

He admits culpability for his crimes, and petitions the District Director for a release from custody until such time as he is deported to Cambodia.  He provided the name and contact information for return to a prior employer upon his release.

## Discussion at Interview

Notes: No interview was conducted in this case.

The INS detainee was found ☐ **CREDIBLE**     ☐ **NOT CREDIBLE**

Explain:

Credibility was not assessed.

## Officer Comments/Analysis & Recommendation

This case involves a citizen of Cambodia, with a Final Order date of 2/28/2002. The normal Removal Period is 90-days from the date of Final Order. He will achieve that date on 5/28/2002.

The Government of Cambodia on 3/22/2002, signed an agreement with the Government of the United States to allow deportation of criminal aliens to Cambodia. The Government of Cambodia instituted a program to begin issuing travel or other documents to allow for repatriation of Cambodian citizens on about 4/20/2002, and are at this time reviewing the travel document applications for those citizens who are currently in custody of the INS.

In accord with Rules an Regulations as published on 12/21/2000, and on 11/14/2001, a period of 180-days was noted to be a reasonable period in which to seek to obtain a travel document, after which each case would be assessed on it's merits for consideration as to whether or not a travel document could be anticipated to be issued within the reasonably foreseeable future.

In this case, there is cause to believe that such a document will be issued within the six-month (180-day) "reasonable period" as provided by Rules and Regulations.

HANG has a substantial criminal history, which involves shooting a firearm at persons while participating in Gang related activities, and for two Felony theft's of personal property.

He has served approximately ½ of the sentence imposed in his criminal cases to date.

His parents are supported by one child, his sister, and would not be able to provide substantial monies for his support upon his release.

In mitigation, he provided that he feels remorse for his criminal actions, and believes that he has rehabilitated himself during his periods of incarceration. He claims that he no longer associates with the members of the criminal street Gang he was a member of.

He provided that he has employment waiting upon his release, and states a desire to go to school and to become a productive member of his community if released.

He has not engaged in any civil uprising or assaults while incarcerated with the County authorities or with INS to date.

His criminal history does not appear to be ascending with regard to degree of seriousness or in nature, with regard of physical violence.

He appears to have strong family support for his release from custody in the even that no travel document is forthcoming from the Government of Cambodia.

In review of this A File, factors as noted in 8 C.F.R. Section 241.4(e) and (f) were assessed, at a minimum.

His application for travel documents is at this time under consideration by the Consul General of Cambodia, and has been referred to Headquarter INS OPS/Travel Document Unit for tracking and assistance.

I recommend that he be continued in custody during the interim that a travel document application is pending. It is at this time perceived to be imminent and impending in issuance to allow for his removal to Cambodia.

File Review Officer       Date:

Reviewed by:       Date:

# DISTRICT DIRECTOR'S CUSTODY DETERMINATION

☐   RELEASE FROM CUSTODY / ORDER OF SUPERVISION

☐   RELEASE FROM CUSTODY / ORDER OF SUPERVISION UNDER BOND

       Bond Amount: _____

☑   CONTINUE IN CUSTODY / SCHEDULE FOR REVIEW IN SIX MONTHS

Comments (attach additional sheet(s) if necessary):


INS District Office: _____ San Diego, CA _____

Signature of District Director: _____ Date _____

(Final 12/21/2000)

49

Attachment B



KINGDOM OF CAMBODIA

NATION · RELIGION · KING

ROYAL EMBASSY OF CAMBODIA
TO THE UNITED STATES OF AMERICA
WASHINGTON, D.C.

Mar 06, 02

Jim Dickerson
Deportation Officer
880 Front Street, Suite 1234
San Diego, CA 92101-8834

**RE:    A27 747 367**
          **Hang, Sophea**

Dear Sir / Madam:

I have the honor to acknowledge receipt of your letter dated Mar 05, 2002, regarding the deportation and the issuance of a travel document for the above mentioned individual.

The Government of the United States of America and the Royal Government of Cambodia have not yet signed the agreement on the deportation and the return of former Cambodian Citizens to Cambodia. Therefore, the Royal Embassy of Cambodia is not authorized to issue all of travel documentation for him pending the agreement reached between the two countries.

Please accept, the assurances of my highest consideration.

Sincerely,

Ly Touch
Second Secretary and Consul

CC: Ministry of Foreign Affairs and International Cooperation

---

4500 16th Street, N.W.
Washington, D.C. 20011

www.embassy.org/cambodia
cambodia@embassy.org

Tel: (202) 726-7742
Fax: (202) 726-8

Attachment C



# KINGDOM OF CAMBODIA

Royal Embassy of Cambodia
to the United States of America
Washington, D.C.

NATION - RELIGION - KING

May 08, 02

Neil Clark
Deportation Officer
1115 North Imperial Avenue
El Centro, CA 92243

**RE:   PIN, BUNREAS**

Dear Sir / Madam:

I have the honor to acknowledge receipt of your letter dated April 29, 2002, regarding the deportation and the issuance of a travel document for the above mentioned individual.

The Government of the United States of America and the Royal Government of Cambodia have not yet signed the agreement on the deportation and the return of former Cambodian Citizens to Cambodia. Therefore, the Royal Embassy of Cambodia is not authorized to issue all of travel documentation for him pending the agreement reached between the two countries.

Please accept, the assurances of my highest consideration.

Sincerely,

Ly Touch
Second  Secretary and Consul

CC: Ministry of Foreign Affairs and International Cooperation

4530 16th Street, N.W.
Washington, D.C. 20011

www.embassy.org/cambodia
cambodia@embassy.org

Tel: (202) 726-7742
Fax: (202) 726-8181

53

Attachment D

Dear Mr. Dickerson,

Please send this letter to the Cambodian Embassy for me. Thank you.

Sincerely,

Sophea Hang

**LY TOUCH**

**C/O Royal Embassy of Cambodia**

**4500 16th Street, N.W.**

**Washington, DC.**

**20011**

Hang, Sophea
A#27 747 367
D-N 102
P.O. BOX 439049
San Ysidro, Ca.
92143-9049

June 28, 2002

Dear Madam:

I am writing this letter to request "travel documents" per the United States Immigration And Naturalization Services orders. I am presently being detained in an I.N.S. facility for removal proceedings based on my criminal record and subsequent sentences. I was born in Thailand and I am a citizen of Cambodia. I would greatly appreciate a written answer to my request so that I can show the I.N.S. that I am fulfilling my commitment in the research as per ordered so by my deportation officer. I thank you for your prompt attention in this matter.

Sincerely,

Hang, Sophea

56

# Exhibit 14

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE:<br>INDEFINITE DETENTION CASES<br>(LAOS)<br><br>v.<br><br>IMMIGRATION AND<br>NATURALIZATION<br>SERVICE, et al.<br><br>Respondents. | ) CASE NO. CV 99-2853-TJH (AJW)<br>)    (And Related Cases)<br>)<br>)<br>)<br>)<br>)<br>)    Ex 9<br>)<br>)<br>)<br>) |

## SUPPLEMENTAL DECLARATION OF JAMES G. HERGEN

1.   This declaration -- which is in response to Magistrate Judge Wistrich's procedural order of May 1, 2000 -- supplements my previous declarations of July 21, September 15, November 17, and 26, 1999, and January 7 and March 23, 2000 in related cases.

2.   I have been personally involved in ongoing efforts to encourage the governments of Cambodia, Laos, and Vietnam to accept back their nationals who have been ordered excluded, deported, or removed from the U.S. by lawful authority.

3.   The Department of Justice has requested that I provide this further supplemental declaration in order to describe the current status of the ongoing diplomatic efforts by the U.S. government to encourage the governments of Vietnam, Cambodia, and Laos to take back their nationals who have been ordered excluded, deported, or removed from the U.S.

4.   I have authorized the Department of Justice to use this declaration in connection with similar pending litigation in this and other federal courts.

5.   A high level delegation of Department of State, Department of Justice, and Immigration and Naturalization Service (INS) officials traveled to Phnom Penh, Cambodia; Hanoi, Vietnam; and Vientiane, Laos for the period April 16-28, 2000 to discuss the repatriation of Cambodian, Vietnamese, and Laotian nationals currently in the U.S. who have been ordered removed to those countries after

**58**

undergoing immigration proceedings. I was a member of the U.S. delegation, and this declaration is based upon my personal knowledge.

6.  The U.S. delegation held discussions with the government of Laos on April 19, 2000 for approximately three hours, with the government of Vietnam on April 21 for approximately six hours, and with the government of Cambodia on April 26 and 27 for approximately six hours.

7.  In my opinion, the discussions with all three states were productive and highly encouraging. All three governments were receptive, polite, interested, and cooperative. Each accepted in principle the international obligation to accept the return of their nationals, and evinced a sincere desire to achieve early agreement on orderly processes for repatriation.

8.  The general structure of the U.S. presentation was essentially the same with respect to all three states. We first briefly reviewed the results of our previous talks in February. Then, we emphasized certain basic precepts that we believe should apply, inter alia: that we should agree first on fundamental principles; that a formal written agreement is not a prerequisite (indeed, the U.S. does not have formal agreements with most states); that no case or class of cases should be prejudged or excluded from consideration, but rather that all cases must be considered on their individual merits in the light of all surrounding facts and circumstances; that any arrangement the two states achieve must be orderly and transparent; and that the requesting state shall bear all expenses relative to the repatriation of particular individuals. In addition, the U.S. delegation invited each state promptly to send a delegation of experts to the U.S., at U.S. expense, in order to interview their detained nationals, to visit our confinement facilities, to meet with our judicial and administrative immigration experts, and to observe how the U.S. repatriates individuals to other states.

9.  As part of its presentation, the U.S. side presented to each of the three states copies of various graphs that reflect, inter alia, the various Asian countries with whom the U.S. maintains repatriation regimes, and that graphically display the numbers of individuals who have recently been repatriated from the U.S. to the various states. The graphs also depict the numbers of Cambodian, Laotian, and Vietnamese nationals who are detained in the U.S. under final orders of deportation, exclusion, or removal.

10. In addition, the U.S. presented to each state in advance of the April meetings for consideration and/or discussion at the meetings a number of actual pending case files.

11. All three states were clearly impressed with the thoroughness and seriousness of the U.S. presentations, and they each readily conceded their international legal obligations to accept back their nationals. Each state was careful to emphasize, however, the serious practical difficulties that could attach to confirming

2

**59**

nationality in a region that had been so destabilized and ravaged by warfare and refugee migration for such a protracted period, particularly where the ostensible nationals had been in the U.S. for lengthy periods.

12. The U.S. side clearly made the most progress with the Government of Cambodia, which agreed to record our current understandings in a "Joint Statement," of April 27. Copy attached as Exhibit 1. (The attached copy is the best copy that is currently available in Washington, D.C.). INS now plans to begin consultations with the Cambodian government at the working level in order to define the technical modalities for confirming nationality, etc., in the expectation that initial repatriations shall occur shortly — hopefully, within the next several months.

13. The U.S. delegation was particularly pleased with the forthcoming attitude of the Government of Laos, which solicited a formal diplomatic note from the U.S. explaining in written detail our proposals. Copy attached as Exhibit 2. (The attached copy is the best copy that is currently available in Washington, D.C.). Since general relations between the U.S. and Laos are currently strained, the U.S. delegation was both surprised and encouraged by the cordiality and receptivity of the Lao delegation to our repatriation overtures. We take this positive attitude on the part of the Laotians to be an extremely encouraging sign under the circumstances.

14. Although the Vietnamese and Cambodian delegations were comprised essentially of the same individuals who had represented those governments at the February discussions, the Laotian delegation was significantly enhanced for the April session, to include the Director General of the Europe and Americas Division, Ministry of Foreign Affairs (Done Somvorachit); the Deputy Director of the Consular Department, Ministry of Foreign Affairs (Seng Soukhathivong); the Deputy Director of the International Organizations Department, Ministry of Foreign Affairs (Southam Sakonhnihom); the Deputy Director of the Treaties and Legal Affairs, Ministry of Foreign Affairs (Phoukhao Phommavongsa); Deputy Director for the Europe and Americas Division, Ministry of Foreign Affairs (Bounneme Chouanghom); and a representative of the External Affairs Department, Ministry of Interior.

15. Based on the April discussions, the current U.S. plan regarding Cambodia is for INS to commence as soon as possible at the working level to review particular cases — probably in the context of a "joint commission" model that has been successfully applied to U.S.-Cambodian efforts to locate and repatriate the remains of American MIA's. We reasonably anticipate that such further discussions will bear fruit in the very near future. We will not be able to assess the likelihood of concrete, early results with Laos until we receive a response to our diplomatic note of April 20. Nevertheless, all of the signs for a positive, early result are excellent, and we remain optimistic that the government of Laos wishes to engage us in good faith to establish a repatriation process soon. Although willing to acknowledge in principle Vietnam's obligation to accept the return of

**60**

its nationals, the Vietnamese — as opposed to the Laotians and Cambodians — appear to prefer a formal, written repatriation agreement, and have undertaken to provide us with written comments on the draft agreement that we provided during our February visit to Hanoi.

16.    Based upon the foregoing, I am strongly of the view that there is a reasonable possibility in the case of all three states that we will be able to negotiate a repatriation arrangement in the foreseeable future. This does not, to be sure, mean that such arrangements are imminent, or that they will result in the immediate repatriation of all nationals of the three states who are currently detained in the U.S. under final orders of deportation, exclusion, or removal. By definition, diplomatic negotiations between sovereign states are delicate, difficult, and complex, and it would be foolhardy for me to attempt to predict dates certain for the conclusion of any such arrangements. Nevertheless, I can say unequivocally that I am extremely encouraged by the apparent good faith and seriousness that all three states have evinced in the course of these negotiations to date, and that I remain sanguine about the prospects for the commencement of repatriations to all three states within the foreseeable future.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

    Executed at Washington, D.C.
    May 5, 2000


                                    James G. Hergen

Exhibits: a/s

61

Exhibit 15



**U.S. Department of Justice**
Immigration and Naturalization Service

---

*Office of the District Director*

*880 Front Street, Suite 1234*
*San Diego, CA 92101-8834*

July 8, 2002

MEMORANDUM FOR: FILE

FROM:     James M. Orrell
          Deportation Officer

SUBJECT:     Issuance of Cambodian Travel Documents

On June 3, 2002, I called the Cambodian Embassy in Washington, D.C. to inquire about the issuance of travel documents on Cambodian nationals currently detained in the San Diego District.

Upon speaking to Mr. Ly Touch, the representative who deals with detained, Cambodian nationals, it was explained to me that all requests for issuance of travel documents must be sent through INS Headquarters and would be considered in turn. Mr. Touch went on to explain that the travel document were being produced in Cambodia and would be issued in three stages: 1) issued to the lame, sick and dying; 2) issued to the elderly; 3) issued to everyone else.

Mr. Touch also stated that the travel documents would be issued in groups and that I would have to contact INS/HQ for more information about the repatriation of Cambodian citizens.

**63**

# Exhibit 16

QUIN DENVIR, CA Bar #049374
Federal Defender
LINDA C. HARTER, CA Bar #179741
Assistant Federal Defender
Office of the Federal Defender
Eastern District of California, Fresno
2300 Tulare Street, Suite 330
Fresno, California 93721-2226
Telephone: (559) 487-5561

# DECLARATION

I, Linda C. Harter, do hereby declare under penalty of perjury as follows:

1. I am an attorney licensed to practice in the State of California and in the United States Federal Court for the Eastern District of California. I am an attorney with the Office of the Federal Defender.

2. The facts in this declaration are based on copious notes taken during the interview and my recollections.

3. On May 10, 2000, I attended an interview with one of my clients and a representative of the Royal Embassy of Cambodia.

4. The interview took place at the Corrections Corporation of America's facility located at 446 Alta Road in San Diego, California.

5. The Cambodian representative was Nou Hak, First Secretary of the Royal Embassy of Cambodia, located at 4500 16th Street, N.W., Washington, D.C.

6. Mr. Hak asked the following questions of my client:

a) Name;
b) Date of Birth;
c) Place of Birth;
d) When, where and how he entered the United States;
e) Legal status at time of entry;
f) Any changes in his legal status;
g) How long had he had been out of incarceration;
h) How long he had been incarcerated;
i) Where he had been incarcerated;
j) What was the basis for incarceration;
k) Was he employed and the type of employment;
l) Does he have either spouse or dependants;
m) Does he have any family and/or friends in Cambodia;
n) Asked the names of his parents and their current address(es).

**65**

1     7. At the conclusion of the interview my client and I spoke with Nou Hak, First Secretary of

2 the Royal Embassy of Cambodia, regarding possible issuance of travel documents for my client.

3     8. First Secretary Hak told me that there was no time table for the Cambodian government's

4 consideration of a repatriation agreement with the United States. He also said that he could not estimate

5 how long the negotiations would take.

6     9. Nou Hak, First Secretary of the Royal Embassy of Cambodia, further said that in instances

7 where there are no known relative or friends in Cambodia, which was the case with my client, it would

8 be unlikely that travel documents would ever be issued.

9     I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28th

10 day of June, 2000, in Fresno, California.

LINDA C. HARTER, Declarant

2

66

Exhibit 17

# POST ORDER CUSTODY REVIEW WORKSHEET FOR FILE REVIEW AND/OR INTERVIEW
## 90-DAY FILE REVIEW

**Detainee Name:** PIN, Bunreas

**Date of Birth:** 11/02/1982

**"A" Number:** A25 373 243

**BOP Number:** Not Applicable

**Country of Birth:** Thailand

**Citizenship:** Cambodia

**Date of Arrival:** 04/23/1983

**Place of Arrival:** San Francisco, California

**Manner of Arrival:** Refugee

**Last Date into INS Custody:** March 08, 2002

**Entered INS Custody from:** ☒ Local, **State**, or Federal Institution

**Location:** Calipatria State Prison, Calipatria, California

**Institution Number:** T 11505

**Immigration History:**
Mr. Pin was admitted into the United States at the port of San Francisco, California on April 23, 1983, as a refugee. On March 12, 1986, his status was adjusted to that of a lawful permanent resident alien at San Francisco, California. On February 22, 2001, Mr. Pin was convicted in the Superior Court of the State of California County of San Joaquin of the offense of count one, **Discharging a Firearm with Gross Negligence** and count two, **Possession of a Loaded Firearm by a Gang Participant** On February 20, 2002, a Notice to Appear was served on Mr. Pin charging him with removability as an alien who, has been convicted of an aggravated felony in violation of Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act and as an alien who at any time after admission has been convicted of a firearms offense in violation of Section 237(a)(2)(C) of the Immigration and Nationality Act. On April 09, 2002, the Immigration Judge ordered Mr. Pin removed to his native Cambodia. Mr. Pin elected to waive his right to appeal the decision of the Immigration Judge to the Board of Immigration Appeals.

**Deportation Officer:** Robert C. Barranco

**Date of Review:** July 12, 2002

**Location Detained:** El Centro Service Processing Center
1115 N. Imperial Ave.
El Centro, California 92243

## Deportation/Exclusion/Removal Proceedings

**List all Charges:** ☒ Section 237 (a)(2)(A)(iii) and 237(a)(2)(C)

☒ Under <u>Final Order</u> dated April 09, 2002, By: IJ ☒ BIA ☐ Other: ☐ U.S. District Court
☒ <u>Appeal Waived</u>/Appeal Time Elapsed

**Travel Document Status/History:**
On April 29, 2002, travel documents were requested from the Embassy of Thailand. On this same date, travel documents were requested from the Embassy of Cambodia. On April 30, 2002, the Royal Thai Consulate General denied a travel document. On May 08, 2002, the Royal Embassy of Cambodia also denied a travel document. On July 03, 2002, a request for assistance in the acquisition of travel documents was sent to the Regional Commissioner for the Western region.

**68**

## Legal Representative / Attorney

G-28 Filed:  ☐ Yes  ☒ No

Notification of Interview Made:  ☐ Yes  ☐ N/A  by:  on:

Name of Representative / Attorney:

Mailing Address:  Telephone Number:

Present during interview:  ☐ Yes  ☐ No

## Criminal History

**Outside the United States:**  There is no criminal history outside of the United States.

**In the United States:** Mr. Pin's criminal convictions are listed in chronological order.

NCIC Checks:  ☒ Criminal History Attached  ☐ No record Found
(State and Federal)

On March 08, 2001, Mr. Pin was convicted of **Willful Discharge of a Firearm in a Negligent Manner**, and of **Carrying a Loaded Firearm by a Gang Participant. Felony.** Sentenced to 2 years in the State prison.

**NOTE:** No other criminal history on file. This is Mr. Pin's **only** criminal conviction.

**69**

# Institutional / Disciplinary Record

Did the detainee have prior Disciplinary Reports?    ☐ Yes    ☒ No

The probation officers report reflects that Mr. Pin's behavior while incarcerated has been satisfactoy.

**Disciplinary Reports and Incidents while in INS Custody?**    ☐ Yes    ☒ No

There is no evidence in Mr. Pin's Service file of any disciplinary action taken against him since entering Service custody.

**70**

# Specifics of Interview

Date of File Review:     June 28, 2002

Date of Detainee Interview: File review only.

Location of Interview:

Interviewing Officer:#1:     Robert C. Barranco

Interpreter Used:  ☐ Yes     ☐ No     Name:
Language/Dialect:

---

**Does the detainee have a place to live in the United States?**     ☒ Yes     ☐ No

Mr. Pin would reside with his mother at 603 Bedlow Drive Stockton, California 95210. C/O Ry Chea, mother. Tel: (209) 477-3790

**Is the detainee subject to any parole or probation requirements?**     ☒ Yes     ☐ No

Mr. Pin will be on parole until March 06, 2005. Parole agent John L. Hall, 125 Bridgeplace Stockton, Ca. 95202. Tel: (209) 948-7652

**Does the detainee have close family ties within the United States?**     ☒ Yes     ☐ No

Mr. Pin has his mother, father and two brothers residing in Stockton, California. He is married to Linda Preap, a citizen of the United States.

**Does the detainee have any community ties or non-governmental sponsors?**     ☒ Yes     ☐ No

Mr. Pin has a friend who has expressed a desire to assist him if granted release. Mr. Laphon Vongkeo.

**Does the detainee have any employment prospects?**     ☒ Yes     ☐ No

Mr. Pin will be assisted by his family in obtaining gainful employment.

**What is the detainee's employment History?**

There is no evidence in Mr. Pin's Service file to support previous employment. **Mr. Pin was a student.**

**What is the detainee's educational level?**

Mr. Pin graduated from Plaza Robles High School. He enrolled in Heald College but did not attend.

**Does the detainee have any vocational training?**

There is no evidence in Mr. Pin's Service file of any type of vocational training.

**71**

## Medical/Psychological Concerns

**Medical/Psychological Report / Summary:** ☐ Attached  ☒ None  ☐ Not Available

There is no evidence in the Service file to support any psychological or medical problem.

**Other documentary evidence for consideration in this review:**

1. Travel Document Request
2. Conviction Document
3. Letters of Support

## Discussion at Interview

The review conducted on today's date is a ninety-day file review pursuant to the permanent custody review procedures published in the Federal Register on December 21, 2000. Therefore, a personal interview was not conducted.

**72**

The INS detainee was found  ⬤ CREDIBLE  ☐ NOT CREDIBLE

A file review only was conducted in Mr. Pin's case and a determination of credibility could not be established due to that a personal interview was not conducted.

## Officer Comments/Analysis & Recommendation

Review of Mr. Pin's Service file, NCIC rap sheets and conviction documents reveal that this is Mr. Pin's first conviction as an adult. Please note that a Probation Officers Report is not available in Mr. Pin's Service file and one will not be forthcoming. This officer was able to obtain a Department of Corrections Institutional Staff Recommendation Summary from Mr. Pin's parole officer wherein Mr. Pin identified gang affiliation to be the **Asian Boys** street gang. The instant offense appears to be Mr. Pin's only criminal conviction. Review of the Institutional Staff Recommendation Summary in lieu of the Probation Officers report or an Arrest Report reveals that during his evaluation interview, Mr. Pin stated to the correctional counselor that "a rival gang member shot at me and I fired back in self defense." Mr. Pin was 17 years old at the time of his arrest for the instant offense. The summary further reveals that Mr. Pin has a juvenile history that includes a sustained petition for **"Discharge Firearm With Negligence"**.

Mr. Pin has an extended family. He has his mother Ry Chea, father Phon Pin, brothers Rith and Ros Pin. Mr. Pin is married to Linda Preap, a citizen of the United States. Mr. Pin has the support of his entire family and also of a friend as evidenced by the letters of support. It should be noted that his brother Ros, can only provide moral support as he is incarcerated in the State of Texas Correctional System.

Mr. Pin appears to have the moral and financial support of his family, and if granted release from Immigration custody, he may be able to assimilate into society. Nevertheless, the seriousness of Mr. Pin's criminal misconduct leads this officer to believe that he may return to the criminal street gang environment that he is used to and become a threat to his community. Mr. Pin relates that he has not been a member of the Asian Boys street gang for nearly two years. This is true but only because Mr. Pin has been incarcerated in the California Department of Corrections system for the past year. Based on the foregoing information gleaned from Mr. Pin's Service file, rap sheets and the Institutional Staff Recommendation Summary, this officer recommends that Mr. Pin remain in custody at this time.

Interviewing Officer #1: _____  Date: _____

Reviewed by: _____  Date: _____

Reviewed by: _____  Date: _____

Reviewed by: _____  Date: _____

73

# DISTRICT DIRECTOR'S CUSTODY DETERMINATION

☐ RELEASE FROM CUSTODY / ORDER OF PINPERVISION

☐ RELEASE FROM CUSTODY / ORDER OF PINPERVISION UNDER BOND

    Bond Amount: _____

☐ CONTINUE IN CUSTODY / SCHEDULE FOR REVIEW IN SIX MONTHS

Comments (attach additional sheet(s) if necessary):

INS District Office: _____

Signature of District Director: _____    Date: _____

# HEADQUARTER'S REVIEW OF CONTINUED DETENTION

| Reviewing Officers | Concur | Reconsider | Date |
|---|---|---|---|
| _____ (Name, Title, Signature) | ____ | ____ | ____ |
| _____ (Name, Title, Signature) | ____ | ____ | ____ |
| _____ (Name, Title, Signature) | ____ | ____ | ____ |

For comments, please refer to the "Headquarters Post Order Custody Review" form.

(Final 10/18/99)

74

Exhibit 18



KINGDOM OF CAMBODIA

NATION - RELIGION - KING

ROYAL EMBASSY OF CAMBODIA
TO THE UNITED STATES OF AMERICA
WASHINGTON, D.C.

May 08, 02

Neil Clark
Deportation Officer
1115 North Imperial Avenue
El Centro, CA 92243

**RE: PIN, BUNREAS**

Dear Sir / Madam:

I have the honor to acknowledge receipt of your letter dated April 29, 2002, regarding the deportation and the issuance of a travel document for the above mentioned individual.

The Government of the United States of America and the Royal Government of Cambodia have not yet signed the agreement on the deportation and the return of former Cambodian Citizens to Cambodia. Therefore, the Royal Embassy of Cambodia is not authorized to issue all of travel documentation for him pending the agreement reached between the two countries.

Please accept, the assurances of my highest consideration.

Sincerely,

Ly Touch
Second Secretary and Consul

CC: Ministry of Foreign Affairs and International Cooperation

Exhibit 19



KINGDOM OF CAMBODIA

NATION - RELIGION - KING

ROYAL EMBASSY OF CAMBODIA
TO THE UNITED STATES OF AMERICA
WASHINGTON, D.C.

May 06, 02

Bunreas Pin
A #25 373 243
1115 N. Imperial Avenue
El Centro, CA 92243

RE:   Requesting for a Travel Document to Cambodia

Dear Bunreas Pin,

I have the honor to acknowledge receipt of your letter, request for a travel document to go to Cambodia.

I would like to inform you that, due to The Government of the United States of America and the Royal Government of Cambodia have not yet signed the agreement on the deportation and the return of former Cambodian Citizens to Cambodia. Therefore, the Royal Embassy of Cambodia is not authorized to issue any travel documentation for you, pending the agreement reached between the two countries.

Please accept, the assurances of my highest consideration.

Sincerely,

Ly Touch
Second  Secretary and Consul

CC: Ministry of Foreign Affairs and International Cooperation.

Exhibit 20



**U.S. Department of Justice**
Immigration and Naturalization Service

---

*880 Front Street, Suite 1234*
*San Diego, CA 92101-8834*

**MEMORANDUM FOR THE REGIONAL DIRECTOR,**
**WESTERN REGION**

FROM:  Office of the District Director,
San Diego, California

Subject:  <u>Travel document acquisition for detained alien PIN, Bunreas A25 373 243</u>

This request for assistance in obtaining an alien travel document for removal from the United States is being prepared and forwarded to your office for action. PIN, Bunreas is in Service custody at the El Centro Service Processing Center, El Centro, California, and has been ordered removed from the United States. He is a convicted aggravated felon and is not subject to release.

On April 29, 2002, the Service formally requested the issuance of a travel document from the Consulate of Cambodia to effect the removal of detainee Pin from the United States. On May 08, 2002, the Royal Embassy of Cambodia formally denied a travel document for Mr. Pin.

Submission of this request to your office is being made in hopes that it can be elevated to the Headquarters level for further action. Attached find copies of our request for travel documents from the Consulate of Cambodia as well as cover letters, Request for travel Document (Service form I-217), Record of Deportable Alien (Service form I-213), Notice to Appear (Service form I-862), the Order of the Immigration Judge, and four (4) alien photographs. Also included in the attachments is information pertinent to properly understanding the case.

We are encouraged and anticipate a prompt and successful response in this request to your office. If further information is required, Robert C. Barranco, Deportation Officer, may be contacted at (760) 336-8946.

Sincerely,

*Adele P.*

Adele J. Fasano
District Director

**80**

Exhibit 21

# POST ORDER CUSTODY REVIEW WORKSHEET FOR FILE REVIEW AND/OR INTERVIEW
## 90-DAY FILE REVIEW

Detainee Name: KHIAW, Phlean

Date of Birth: 05/05/1971

"A" Number: A23 861 532

BOP Number: Not Applicable

Country of Birth: Cambodia

Country of Citizenship: Cambodia

Date of Arrival: 12/12/1979

Place of Arrival: San Francisco, California

Manner of Arrival: Refugee

Last Date into INS Custody: April 08, 2002

Entered INS Custody from: ☒ Local, <u>State</u>, or Federal Institution

Location: Calipatria State Prison, Calipatria, California

Institution Number: H 39881

Immigration History:

Mr. Khiaw was admitted into the United States at the port of San Francisco, California on December 12, 1979, as a refugee. On September 27, 1984, his status was adjusted to that of a lawful permanent resident alien at San Diego, California. On March 06, 1991, Mr. Khiaw was convicted in the Municipal Court of San Diego, California of the offense of **Under the Influence of a Controlled Substance, to wit, Cocaine.** On October 05, 1992, an Order to Show Cause was served on Mr. Khiaw charging him with deportability as an alien, who, at any time after entry, has been convicted of a violation of any law relating to a controlled substance in violation of Section 241(a)(2)(B)(I) of the Immigration and Nationality Act. On December 29, 1992, the Immigration Judge granted **Mr. Khiaw a waiver of deportation pursuant to section 212(c) of the Act.** On May 06, 1994, Mr. Khiaw was convicted in the Superior Court of California, County of San Diego of the offense of **Attempted Murder.** On March 07, 2002, Mr. Khiaw was served with a Notice to Appear by the Immigration Service charging him with removability as an alien who has been convicted of an aggravated felony in violation of Section 237(a)(2)(A)(iii) of the INA. On April 04, 2002, the Immigration Judge ordered Mr. Khiaw removed to his native Cambodia. Mr. Khiaw elected to waive his right to appeal the order to the Board of Immigration appeals.

Deportation Officer: Robert C. Barranco

Date of Review: May 28, 2002

Location Detained: El Centro Service Processing Center
1115 N. Imperial Ave.
El Centro, California 92243

## Deportation/Exclusion/<u>Removal</u> Proceedings

List all Charges: ☒ Section 241 (a)(2)(A)(iii), 237(a)(2)(A)(ii) and 241(a)(2)(C)

☒ Under <u>Final Order</u> dated April 04, 2002, by: IJ ☒ BIA ☐ Other: ☐ U.S. District Court

☒ <u>Appeal Waived</u>/Appeal Time Elapsed

Travel Document Status/History:

On May 02, 2002, a request for travel documents was sent to the Consulate of Cambodia. On this same date a request for assistance in the acquisition of the travel documents was sent to the Regional Commissioner for the Western Region. A letter from the Royal Embassy of Cambodia indicating that the Embassy will **not issue a travel document** was received by Mr. Khiaw.

**82**

## Legal Representative / Attorney

G-28 Filed: ☐ Yes ☒ No

Notification of Interview Made: ☐ Yes ☐ N/A by: on:

Name of Representative / Attorney:

Mailing Address: Telephone Number:

Present during interview: ☐ Yes ☐ No

## Criminal History:

**Outside the United States:** There is no criminal history outside of the United States.

**In the United States:** Mr. Khiaw's criminal convictions are listed in chronological order.

**NCIC Checks:** ☒ Criminal History Attached ☐ No record Found
(State and Federal)

On March 06, 1991, Mr. Khiaw was convicted of Count one: Use/Under the Influence of a controlled substance, Count two: Possess/Sell Switch-Blade Knife. Misdemeanors

On February 25, 1991, Mr. Khiaw was convicted of Burglary First Degree. Felony

On March 11, 1993, Mr. Khiaw was convicted of Felon/Addict in Possession of a Firearm. Felony.

On June 16, 1994, Mr. Khiaw was convicted of Count 4, Attempted Murder and Count 5, Assault with a Firearm on a Person. Sentenced to 8 years in prison with an added 7 years enhancement for the use of firearms and for inflicting great bodily injury upon a person, for a total of 15 years incarceration.

**83**

## Institutional / Disciplinary Record

Did the detainee have prior Disciplinary Reports?    ☐ Yes    ☒ No

The probation officers report reflects that Mr. Khiaw's behavior while incarcerated has been satisfactoy.

Disciplinary Reports and Incidents While in INS Custody?    ☐ Yes    ☒ No

There is no evidence in Mr. Khiaw's Service file of any disciplinary action taken against him since entering Service custody.

**84**

Date of File Review:          May 28, 2002

Date of Detainee Interview: File review only.

Location of Interview:

Interviewing Officer:#1:    Robert C. Barranco

Interpreter Used:    ☐ Yes    ☐ No    Name:
Language/Dialect:

Does the detainee have a place to live in the United States?    ☒ Yes    ☐ No

Mr. Khiaw would reside with his mother and a brother at 7127 Hyatt Street San Diego, California 92111. Tel: (858) 505-9497.

Is the detainee subject to any parole or probation requirements?    ☒ Yes    ☐ No

Mr. Khiaw's parole officer is Merrie Birkenbach San Diego Unit One. Tel: (619) 718-7800 Ext. 228. Mr. Khiaw will be on parole until April 04, 2005.

Does the detainee have close family ties within the United States?    ☒ Yes    ☐ No

Mr. Khiaw has his mother and two older brothers residing at the above address. Mr. Khiaw also has an older sister residing in Chula Vista, California and an older brother residing in Vancouver, Washington.

Does the detainee have any community ties or non-governmental sponsors?    ☐ Yes    ☒ No

Does the detainee have any employment prospects?    ☐ Yes    ☒ No

There is no evidence in Mr. Khiaw's Service file of any offers of employment.

What is the detainee's employment history?

The probation officers report reflects that Mr. Khiaw was employed as a silk screener for a couple of years. His source of support before his prison sentence was his mother and siblings.

What is the detainee's educational level?

Mr. Khiaw attended Crawford High School until the 10th. grade when he dropped out.

Does the detainee have any vocational training?

Mr. Khiaw has several certificates that he earned while in prison relating to the silk screening industry.

85

## Medical/Psychological Concerns

Medical/Psychological Report / Summary:  ☐ Attached  ☒ None  ☐ Not Available

There is no evidence in the Service file to support any psychological or medical problem.

---

**Other documentary evidence for consideration in this review:**

1. Travel Document Request
2. Conviction Document
3. Probation Officer's Report
4. Letter of Denial of Issuance of Travel Document from the Cambodian Embassy
5. Certificates of Achievement

---

## Discussion at Interview

The review conducted on today's date is a ninety-day file review pursuant to the permanent custody review procedures published in the Federal Register on December 21, 2000. Therefore, a personal interview was not conducted.

**86**

The INS detainee was found ☐ **CREDIBLE** ☐ **NOT CREDIBLE**
A file review only was conducted in Mr. Khiaw's case and a determination of credibility could not be established due to that a personal interview was not conducted.

## Officer Comments/Analysis & Recommendation

Review of Mr. Khiaw's Service file, NCIC rap sheets, conviction documents and probation officers report reveals that Mr. Khiaw is a member of the Oriental Boys Soldiers (OBS) street gang. The instant offense appears to be gang related, in that the victims of the attempted murder and assault with a firearm charge are members of the rival street gang, the Oriental Killer (OK) street gang. The information sheet of conviction document number CR144295 reveals 10 counts of attempted murder and 9 counts of assault with a firearm. Three separate shootings occurred from 12/31/1991 and new years day 01/01/1992. The weapons used were a .380 caliber semi-automatic, a .357 caliber revolver and an AK-47 assault rifle. One of the victims of these shootings was hospitalized with life threatening injuries and was placed on life support systems. Mr. Khiaw was convicted of one count of **Attempted Murder** and one count of **Assault with a Firearm**. He was sentenced to **seven years** confinement for the attempted murder charge and **one year** for the assault with a firearm conviction. An **additional 4 years** enhancement for the use of a firearm and an **additional 3 years** enhancement for personally inflicting great bodily injury on a person was added to his sentence for a total of **15 years incarceration.**

Mr. Khiaw appears to have strong family ties. His mother and an older brother reside in San Diego, California. Mr. Khiaw relates that he will be living with his mother and brother at 7127 Hyatt St. San Diego, California. Mr. Khiaw also has an older sister and two older brothers living in the San Diego area.

While incarcerated, Mr. Khiaw participated in various academic and vocational programs provided by the California Department of Corrections. Mr. Khaiw has earned certificates in academic education in ABE-1 and ABE-2 classes and also in the re-entry program. Mr. Khaiw has also successfully completed vocational courses in silk screening, upholstering and business management. It appears that Mr. Khaiw has prepared himself for possible release into his community. With the financial and emotional assistance from his family, Mr. Khaiw would appear to be ready for release from INS custody. Nevertheless, the probation officers report reflects that Mr. Khaiw's criminal convictions have steadily increased in seriousness from being under the influence of drugs to possession of a firearm by a felon to finally attempted murder with the use of firearms. Based on the foregoing information gleaned from Mr. Khaiw's Service file, probation officers report, rap sheets and conviction documents, this officer believes that Mr. Khaiw will become a threat to his community and recommends **continued detention** at this time.

Interviewing Officer #1: _____    Date: 05-04-3-003

Reviewed by: _____    Date: _____

Reviewed by: _____    Date: _____

**87**

# DISTRICT DIRECTOR'S CUSTODY DETERMINATION

☐     RELEASE FROM CUSTODY / ORDER OF SUPERVISION

☐     RELEASE FROM CUSTODY / ORDER OF SUPERVISION UNDER BOND

          Bond Amount: _____

☐     CONTINUE IN CUSTODY / SCHEDULE FOR REVIEW IN SIX MONTHS

Comments (attach additional sheet(s) if necessary):


INS District Office:           _____

Signature of District Director:       _____    Date:_____

# HEADQUARTER'S REVIEW OF CONTINUED DETENTION

| Reviewing Officers | Concur | Reconsider | Date |
|---|---|---|---|
| _____<br>(Name, Title, Signature) | _____ | _____ | _____ |
| _____<br>(Name, Title, Signature) | _____ | _____ | _____ |
| _____<br>(Name, Title, Signature) | _____ | _____ | _____ |

For comments, please refer to the "Headquarters Post Order Custody Review" form.

(Final 10/18/99)

**88**

Exhibit 22

To: Cambodian Consular

   I Khiaw, Phlean am requesting a
Traveling Document in order of the U.S. I.N.S
to deport me to Cambodia.
1 Please return my Certified mail receipt, so I
can show the I.N.S. that I sent you this
letter requesting for a travel document.

   Thank you.

Name: Khiaw, Phlean
Facility ID: 23861532
Location: C/K-207L
Trans. Type: M
Check Number: 2377
Comment: send certified letter

Scanner ID:SDG19009
Deduction Date: 05/03/2002

Receipt #: 245447

Total Amount of Deduction: 4.17

Account 1 - Balance Prior to Deduction: 93.09
Account 1 - Amount of Deduction: 4.17
Account 1 - Balance After Deduction: 88.92



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

| | | |
|---|---|---|
| Postage | $ .57 | |
| Certified Fee | 2.10 | Postmark Here |
| Return Receipt Fee (Endorsement Required) | 1.50 | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 4.17 | |

Recipient's Name (Please Print Clearly) (to be completed by mailer) C-K-207
Khiaw, Phlean #A23-861-532
Street, Apt. No.; or PO Box No.
P.O. Box 439049
City, State, ZIP+4
San Ysidro, CA 92143

PS Form 3800, February 2000                See Reverse for Instructions

7000 1670 0000 0278 0077

**91**

Exhibit 23

KINGDOM OF CAMBODIA



NATION - RELIGION - KING

ROYAL EMBASSY OF CAMBODIA
TO THE UNITED STATES OF AMERICA
WASHINGTON, D.C.

May 10, 02

Khiaw, Phlean
# A23 861 532
CK 207
P.O. Box 439049
San Ysidro, CA 92143-9049

RE:    Requesting for a Travel Document to Cambodia

Dear Khiaw Plean,

I have the honor to acknowledge receipt of your letter dated April 23, 2002, request for a travel document to go to Cambodia, as required by INS.

Since the Royal Embassy of Cambodia has not received any of the information from our Government regarding the deportation of Cambodian detainees to Cambodia. Therefore, the Royal Embassy of Cambodia is not authorized to issue any travel documentation for you, pending for the agreement reached between the two countries.

Please accept, the assurances of my highest consideration.

Sincerely,

Ly Touch
Second Secretary and Consul

CC: Ministry of Foreign Affairs and International Cooperation.

# Exhibit 24



**U.S. Department of Justice**
Immigration and Naturalization Service

*880 Front Street, Suite 1234*
*San Diego, CA 92101-8834*

## MEMORANDUM FOR THE REGIONAL DIRECTOR, WESTERN REGION

**FROM:** Office of the District Director,
San Diego, California

**Subject:** Travel document acquisition for detained alien KHIAW, Phlean, A23 861 532, Cambodia.

This request for assistance in obtaining an alien travel document for removal from the United States is being prepared and forwarded to your office for action. KHIAW, Phlean is in Service custody at the El Centro Service Processing Center, El Centro, California, and has been ordered removed from the United States. He is a convicted aggravated felon and is not subject to release.

On April 25, 2002, the Service formally requested the issuance of a travel document to effect the removal of detainee KHIAW, Phlean from the United States. To date there has been no reply.

Submission of this request to your office is being made in hopes that it can be elevated to the Headquarters level for further action. Attached find copies of our original request for assistance, the cover letter to the Embassy of Cambodia, Warrant of Removal/Deportation (Service form I-205), Request for Travel Document (Service form I-217), Record of Deportable Alien (Service form I-213), Notice to Appear (Service form I-862), the Order of the Immigration Judge, and four (4) alien photographs.

We are encouraged and anticipate a prompt and successful response in this request to your office. If further information is required, Kathleen M. Martell, Deportation Officer, may be contacted at (760) 353-2170, extension 158.

Sincerely,

Adele F.

Adele J. Fasano
District Director

**95**

Exhibit 25

# POST ORDER CUSTODY REVIEW WORKSHEET FOR FILE REVIEW
## AND/OR INTERVIEW
### 90-Day Review, Section 241a

Detainee Name: KUY, Savarn     Date of Birth: 1/6/1973    "A" Number: 27 363 380

AKAs: None determined.          BOP Number: None to date.

Country of Birth: CAMBODIA      Citizenship: CAMBODIA

Date of Arrival: 2/21/1985      Place of Arrival: Seattle, WA.

Manner of Arrival: Refugee      Last Date into INS Custody: 4/3/2002

Entered INS Custody from:       ☐  Local, State, or Federal Institution
                                ☒  Other

Location:    Arrested by INS Special Agents at his residence at 2625 44th Street, #4, San Diego, CA., 92105

Immigration History: (Prior INS arrest[s]/parole/bond/custody information)

Describe:      He entered the United States at Seattle, Washington on 2/21/1985, as a Refugee. He then adjusted status to that of Permanent Resident Alien at San Diego, CA., on 10/28/1986, with Immigrant status retroactive to his date of entry. Class RE-8.

He has no prior Immigration arrests or entry into Proceedings.

He was served an NTA (Form I-862) on 4/3/2002, to enter him into Removal Proceedings based on convictions for two or more crimes involving moral turpitude, not arising out of the same scheme of criminal misconduct.

He was ordered Removed to Cambodia by the Immigration Judge on 5/22/2002, and then waived appeal rights of that decision.

On 7/19/2002, he was provided via personal service a Notice of File Custody Review, with anticipated completion on or before 8/22/2002.

---

Deportation Officer: DICKERSON          Date of Review:     8/22/2002

Location Detained:  Corrections Corporation of America, Inc.
                    San Diego Detention Facility
                    446 Alta Road
                    San Diego, CA., 92143

**97**

Deportation/Exclusion/Removal Proceedings

List all Charges: ☒ Section 237 (a) (2) , (A) , (ii) of the INA, as amended.
☐ Section 212 (a)         ,         ,
☐ Section 241             ,         ,

☒ Under <u>Final Order</u> dated <u>5/22/2002</u> by ☒ IJ ☐ BIA ☐ Other

☒ Appeal Waived/Appeal Time Elapsed

Travel Document Status/History:

Application for a removal travel document was made to the Government of Cambodia via express mail on 6/7/2002. That application is still pending with the Consul General.

## Legal Representative / Attorney

G-28 Filed: ☒ Yes     ☐ No

Notification of Interview Made: ☒ Yes     ☐ N/A     by:          on:

Name of Representative / Attorney:     Jason Ser, Esquire

Mailing Address:     Federal Defenders of San Diego, Inc.
Home Savings Tower
225 Broadway, Suite 900
San Diego, CA 92101

Telephone Number: (619) 234 8467
FAX:                 (619) 687 2666

Present during interview:          ☐ Yes     ☐ No     ☒ N/A

**98**

## Criminal History

**Outside the United States:** None determined.
(specify nature of crime, whether convicted, sentence imposed, date, and country)

**In the United States:** See below listing.

NCIC Checks:        ☒ Criminal History Attached      ☐ No record Found
                                       (State and Federal)

       Summary of NCIC Checks:    His criminal conviction history is provided in reverse order to date of conviction, as follows:

**Convicted on acceptance of plea on 9/13/2001, in Superior Court, San Diego under case SCD 155567, for the offense of Welfare Fraud**, in excess of $400, a Felony, in violation of the California Welfare and Institutions Code (WIC), and for which he was then sentenced to perform 25-days physical work in a non-profit organization, and was placed under 5 years Summary Probation.

**He was arrested on 1/9/2002, and sentenced on 1/11/2002, to serve 25 days in Jail, and with the 5-years Probation continued.**

**Arrested on 1/14/1998, by the California Fish and Game Office, in San Diego, CA., for taking and possessing of more than 350 Ghost Shrimp in violation of 14 CCR 29.87, a misdemeanor**, and was convicted on 1/14/1998 in Municipal Court, San Diego, CA., under case M-749176 for the offense. The shrimp were returned to the San Diego River, and he was placed under 3-years Probation, and fined $455 (including Fine, Restitution and Court costs.

**Convicted on 11/09/1995, in Municipal Court, San Diego, CA., under case M709051DV for the offense of Battery, a misdemeanor,** in violation of Sections 242/243A of the California Penal Code (PC), and then sentenced to 3-years Probation with a 27-days sentence to serve in Work Release at a volunteer organization. The initial charge at time of arrest was battery on spouse in violation of Section 273.5 PC.

**Convicted on 1/13/1992, in Superior Court, San Diego, under case CR127772, for the offense of Burglary, a Felony,** in violation of Section 459 of the California Penal Code, and for which he was then sentenced to serve 60 days in Jail, and placed under 3-years Probation.

He violated Probation in this case and on 6/2/1993, was sentenced to serve 49 days in Jail.

**99**

## Institutional / Disciplinary Record

Did the detainee have prior Disciplinary Reports?  ☐ Yes  ☒ No

    If Yes, List & Describe:

    Source:

Disciplinary reports and Incidents while in INS Custody?  ☐ Yes  ☒ No

    If Yes, List & Describe:

## Specifics of Interview

Date of File Review:  8/22/2002

Date of Detainee Interview: N/A

Does the detainee have a place to live in the United States?  ☒ Yes  ☐ No

    Address:  2625 44th Street #2, San Diego, CA 92105

    C/O: Nouanesy Phandanouvong  (619) 266 4452.

Is the detainee subject to any parole or probation requirements?  ☒ Yes  ☐ No

    Describe:  He remains on Probation as granted in San Diego County, under case CD155567, for a term of 5 years.

Does the detainee have close family ties within the United States?  ☒ Yes  ☐ No

    Describe:  Parents and spouse who are Immigrants into the United States; niece, and he claims to have 5-6 USC children, who reside with his mother at the above address.

Does the detainee have any community ties or non-governmental sponsors?

        ☒ Yes  ☐ No

    Describe:  His parents and spouse provide sponsorship for his release.

**100**

Does the detainee have any employment prospects?  ☒ Yes  ☐ No

Describe:    KANG DRYCLEANING, with employment offered by Darey Kang, with contact at (858) 578 8540. (Verified telephonically as valid offer 8/22/02)

**What is the detainee's employment history?**

Describe:    claims prior employment at IBUS PHOENIX, Balboa Street, San Diego, CA., as an assembler, from 3/2000 to 2/2002.

**What is the detainee's educational level?**

Describe:  Not noted in A File records.

**Does the detainee have any vocational training?**

Describe:  None claimed.

---

## Medical/Psychological Concerns

Medical/Psychological Report / Summary:  ☐ Attached  ☒ None  ☐ Not Available

Date and Source:

---

**Other documentary evidence for consideration in this review:**

His Attorney of Record, Jason Ser of the Federal Defender's Office provided a written statement regarding his ties, equities, intended residence and verified employment upon release.

He provides also a personal letter to articulate his family ties and desire to be free to provide them support. He claims 5 children, four of whom reside with his mother at this time, and for whom he is financially responsible.

He pleads for release at this time.

## Discussion at Interview

Notes: No interview was conducted. Statements provided during Court remain fresh at this time for purposes of this File review.

The INS detainee was found ☐ **CREDIBLE** ☐ **NOT CREDIBLE**

**Explain:**

Not assessed. No personal interview conducted.

## Officer Comments/Analysis & Recommendation

A complete file review was completed at this time, with emphasis placed on his criminal history, ties, equities, and likelihood of obtaining a travel document. Other factors as enumerated in 8 C.F.R. 241.4(e) and (f) were also considered in completion of this review, at a minimum.

He provided materials personally and through his Attorney of Record for incorporation into his File Review at this time.

He notes a strong family involvement, especially with his mother and four of his five children. He claims that he has worked and paid support and childcare costs, as well as provided for his mother when not incarcerated.

His criminal history does not appear to be ascending in degree of severity of sentencing, or in nature of offense. He has received the minimal sentencing allowable for all offenses to date, with his Jail time suspended in lieu of being allowed to work for a volunteer organization through a Work Release program.

To date, he has been convicted for Burglary of an automobile (Felony theft); battery upon his wife ( a misdemeanor conviction); attempted theft of protected shrimp (a misdemeanor); and for obtaining Welfare through fraud (a Felony).

He has violated Probation on both of his Felony convictions, resulting in a modification of his sentence in both cases.

There is no indication of any involvement of any nature with Criminal Street gangs, or other organized criminal groups.

**102**

KUY was taken into custody at his home without incident, and remanded into INS custody on 4/3/2002, and has been under a Final Order of Removal since 5/22/2002.

A travel document was applied for on 6/7/2002, and is still pending with the Consulate of Cambodia, who entered into an agreement on 3/22/2002, to accept deportees to Cambodia.

His travel document application is still pending at this time.

He has been convicted of a misdemeanor crime of violence only, and although he has violated Probation twice, there does not appear to be a significant threat of violence or risk of his absconding or failing to appear when directed if released from custody at this time on an Order of Supervision.

The Consul General provides a personal interview with applicants to determine their right to hold Cambodian documents, and to date no interview has been requested by the Consul General in this case to reflect intent to issue in the immediate future.

It was stated by Court that six-months is a reasonable time for the INS to obtain a removal travel document and to effect removal of the alien.

In this particular case, I recommend that he be released from custody at this time pending receipt of a removal travel document from the Government of Cambodia, for humanitarian purposes.

His A File reflects that he and his family are existing at poverty level, and therefore I recommend that no surrender bond be required at this time.

Deportation Officer   :                        8/22/2002
                                               Date:

Reviewed by:                                   9/20/02
                                               Date:

**103**

# DECIDING OFFICIALS CUSTODY DETERMINATION

☐ RELEASE FROM CUSTODY / ORDER OF SUPERVISION

☐ RELEASE FROM CUSTODY / ORDER OF SUPERVISION UNDER BOND

   Bond Amount: _____

☒ CONTINUE IN CUSTODY / SCHEDULE FOR REVIEW IN SIX MONTHS

Comments (attach additional sheet(s) if necessary): the Government of Cambodia has started to issue travel documents. At this time, Deportation is considered to be imminent.

INS/DRO Field Office: _____ San Diego, CA _____

Signature of Deciding Official: _____  Date: 8/22/02

(Final 12/21/2000)

**104**

Exhibit 26

# POST ORDER CUSTODY REVIEW WORKSHEET FOR FILE REVIEW AND/OR INTERVIEW
## 90-DAY FILE REVIEW

Detainee Name: CHHIN, Toeun

Date of Birth: 07/03/1978

"A" Number: A25 281 869

BOP Number: Not Applicable

Country of Birth: Cambodia

Citizenship: Cambodia

Date of Arrival: 09/25/1981

Place of Arrival: Honolulu, Hawaii

Manner of Arrival: Refugee

Last Date into INS Custody: February 28. 2002

Entered INS Custody from:   ☒   Local, <u>State</u>, or Federal Institution

Location: Halawa Community Correctional Center, Honolulu, Hawaii. Institution Number: Unk.

## Immigration History:

Mr. Chhin was admitted into the United States at the port of Honolulu, Hawaii on September 25. 1981, as a refugee. On October 27, 1983, his status was adjusted to that of a lawful permanent resident at Honolulu, Hawaii. On April 16, 1998, Mr. Chhin was convicted in the Circuit Court of the First Circuit of the State of Hawaii of the offense of Assault in the Second Degree. On September 01. 1999. Mr. Chhin was convicted in the Circuit Court of the First Circuit of the State of Hawaii of the offense of Promoting a Dangerous Drug in the Third Degree. On March 24, 2000. a Notice to Appear was served on Mr. Chhin charging him with removability as an alien who has been convicted of an aggravated felony in violation of Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, and as an alien who at any time after admission has been convicted of a violation of a controlled substance in violation of Section 237(a)(2)(B)(I) of the Immigration and Nationality Act. On May. 06, 2002, the Immigration Judge ordered Mr. Chhin removed to his native Cambodia. Mr. Chhin elected to waive his right to appeal the decision of the Immigration Judge to the Board of Immigration Appeals.

| | |
|---|---|
| Deportation Officer: Robert C. Barranco | Date of Review: June 17, 2002 |
| Location Detained: El Centro Service Processing Center 1115 N. Imperial Ave. El Centro, California 92243 | |

## Deportation/Exclusion/Removal Proceedings

List all Charges:   ☒   Section 237 (a)(2)(A)(iii) & 237(a)(2)(B)(i)

☒   Under <u>Final Order</u> dated May 06, 2002 by: IJ ☒   BIA ☐   Other: ☐   U.S. District Court
☒   <u>Appeal Waived</u>/Appeal Time Elapsed

## Travel Document Status/History:

On April 26, 2002, travel documents were requested by the removal unit in Honolulu, Hawaii from the Embassy of Cambodia. On this same date a request for assistance in the acquisition of the travel documents was sent to Headquarters in Washington D.C. On May 28, 2002, a request again was made to the Royal Embassy of Cambodia in Washington D.C. To date a response from the Cambodian Embassy has not been received. On June 20, 2002, a request for assistance in the acquisition of the travel documents was sent to the Regional Commissioner for the Western region.

**106**

## Legal Representative / Attorney

G-28 Filed:  ☐ Yes  ☒ No

Notification of Interview Made:  ☐ Yes  ☐ N/A  by:  on:

Name of Representative / Attorney:

Mailing Address:  Telephone Number:

Present during interview:  ☐ Yes  ☐ No

## Criminal History

Outside the United States:  There is no criminal history outside of the United States.

In the United States: Mr. Chhin's criminal convictions are listed in chronological order.

NCIC Checks:  ☒ Criminal History Attached  ☐ No record Found
(State and Federal)

On April 24, 1997, Mr. Chhin was convicted of **Theft 4**. **Petty Misdemeanor**.

On December 28, 1999, Mr. Chhin was convicted of **Consume/Possess Intoxicating Liquid in a Vehicle**. **Petty Misdemeanor**.

On April 16, 1998, Mr. Chhin was convicted of **Assault 2nd. Degree**. **Class C Felony**. Sentenced to 1 year confinement.

On September 01, 1999, Mr. Chhin was convicted of **Prohibited Acts Related to Drug Paraphernalia**. **Class C Felony**. He was sentenced to 5 years confinement.

On September 01, 1999, Mr. Chhin was convicted of **Promoting a Dangerous Drug**. **Class C Felony**. Sentenced to 5 years confinement. Both of these narcotic related convictions were to run concurrently.

**107**

## Institutional / Disciplinary Record

**Did the detainee have prior Disciplinary Reports?** ☐ Yes ☒ No

The probation officers report reflects that Mr. Chhin's behavior while incarcerated has been satisfactoy.

**Disciplinary Reports and Incidents while in INS Custody?** ☐ Yes ☒ No

There is no evidence in Mr. Chhin's Service file of any disciplinary action taken against him since entering Service custody.

**108**

# Specifics of Interview

**Date of File Review:** June 17, 2002

**Date of Detainee Interview:** File review only.

**Location of Interview:**

**Interviewing Officer:#1:** Robert C. Barranco

**Interpreter Used:** ☐ Yes  ☐ No  **Name:**  **Language/Dialect:**

---

**Does the detainee have a place to live in the United States?**  ☒ Yes  ☐ No

Mr. Chhin would reside with his uncle at 634 E. Waipa Lane, Honolulu, Hawaii 96817. C/O Sokhar Chhin, uncle of Mr. Chhin. Tel: (808) 841-4812. Work number (808) 306-9299.

**Is the detainee Subject to any parole or probation requirements?**  ☒ Yes  ☐ No

Mr. Chhin will be on parole until December 16, 2003. Parole Officer, Edward Vergara. Hawaii Paroling Authority, Capitol Center 1177 Alakea St. Honolulu, Hawaii 96813. Tel: (808) 587-5600

**Does the detainee have close family ties within the United States?**  ☒ Yes  ☐ No

Mr. Chhin has an uncle, Sokhan Chhin residing in Providence Rhode Island. He has another uncle, Chamron Chhin, residing in Honolulu, Hawaii. Mr. Chhin's parents are both deceased. ————————

**Does the detainee have any community ties or non-governmental sponsors?**  ☒ Yes  ☐ No

Mr. Chhin relates that he will be assisted by the Alulike Community Center, and also Victory Ohana in obtaining gainful employment and guidance.

**Does the detainee have any employment prospects?**  ☒ Yes  ☐ No

Mr. Chhin will be assisted by the aforementioned community services in obtaining gainful employment.

**What is the detainee's employment History?**

Mr. Chhin was employed as a landscaper.

**What is the detainee's educational level?**

Mr. Chhin graduated from high school.

**Does the detainee have any vocational training?**

There is no evidence in Mr. Chhin's Service file of any type of vocational training. Nevertheless, Mr. Chhin has certificates in Anger Management, Mental Health and Substance Abuse that were lost by INS when he was transferred to Florence, Arizona detention facility from Hawaii.

**109**

## Medical/Psychological Concerns

Medical/Psychological Report / Summary:  ☐ Attached  ☒ None  ☐ Not Available

There is no evidence in the Service file to support any psychological or medical problem.

**Other documentary evidence for consideration in this review:**

1. Travel Document Request
2. Conviction Document
3. Letters of Support

## Discussion at Interview

The review conducted on today's date is a ninety-day file review pursuant to the permanent custody review procedures published in the Federal Register on December 21, 2000. Therefore, a personal interview was not conducted.

110

The INS detainee was found ☐ **CREDIBLE** ☐ **NOT CREDIBLE**

A file review only was conducted in Mr. Chhin's case and a determination of credibility could not be established due to that a personal interview was not conducted.

## Officer Comments/Analysis & Recommendation

Review of Mr. Chhin's Service file reveals that except for the April 16, 1998 Assault in the 2nd. degree conviction, his criminal convictions are relatively minor in nature. In reference to the assault conviction. Mr. Chhin relates that while at a nightclub with his girlfriend Rosalina Talia, they were approached by three intoxicated men who insisted on attempting to dance with Rosalina. Mr. Chhin states that he and Rosalina left the nightclub. The three men left after them and again approached the girl. On of the men grabbed the girl and Mr. Chhin pushed him away. According to Mr. Chhin, it was then that one of the men produced a knife and Mr. Chin struck him once in the face with a closed fist. Rosalina Talia's letter appears to corroborate Mr. Chhin's version of the incident. The Honolulu Police Department report reflects an entirely different version of the incident. The police report states, that the victim was assaulted by Mr. Chhin without provocation and was struck in the face with a closed fist which caused damage to the victims eye.

Mr. Chhin immigrated to the United States with his grandmother and an uncle at the age of 3 years. Mr. Chhin's parents are deceased. Mr. Chhin's grandmother passed away in February while he was in prison. Mr. Chin relates that he has two uncles residing in the United States. Mr. Sokhar Chinn has written a letter of support wherein he states that he will provide Mr. Chhin with a home and assist him in obtaining gainful employment. Mr. Chhin's uncle also states that he wants to enroll his nephew into two non-governmental organizations that assist ex-felons in training and job placements. The organizations are Victory Ohana and Alulike Community Center of Honolulu. Mr. Chhin has a son with his former girlfriend that he wishes to support if granted release from INS custody.

While incarcerated, Mr. Chhin relates that he enrolled in anger management, mental health and substance abuse classes. He relates that he has received certificates for these classes but these certificates were lost when he was transferred to Florence, Arizona from Hawaii. This officer contacted Mr. Edward Vergara, Mr. Chhin's parole officer at the Hawaii Paroling Authority in Honolulu. Mr. Vergara relates that Mr. Chhin will be reporting to him for parole supervision until December 16, 2003. Mr. Vergara informs this officer that Mr. Chhin does not have any gang affiliation and is aware of the organizations that Mr. Chhin wishes to enroll in and approves of them.

Based on the foregoing information gleaned from Mr. Chhin's Service file, police reports and letters from his family. this officer believes that with the assistance from his uncle and enrollment into the non-governmental organizations, Mr. Chhin will not become a threat to his community. Therefore this officer recommends release on an Order of Supervision.

**111**

Interviewing Officer #1: _____  Date: 06-20-02

Reviewed by: _____  Date: 6-20-02

Reviewed by: _____  Date: 6/21/02

Reviewed by: _____  Date: _____

112

## DISTRICT DIRECTOR'S CUSTODY DETERMINATION

☐    RELEASE FROM CUSTODY / ORDER OF CHHINPERVISION

☐    RELEASE FROM CUSTODY / ORDER OF CHHINPERVISION UNDER BOND

        Bond Amount: _____

☑    CONTINUE IN CUSTODY / SCHEDULE FOR REVIEW IN SIX MONTHS

Comments (attach additional sheet(s) if necessary):

INS District Office: _____

Signature of District Director: _____  Date: _____

## HEADQUARTER'S REVIEW OF CONTINUED DETENTION

| Reviewing Officers | Concur | Reconsider | Date |
|---|---|---|---|
| (Name, Title, Signature) | ___ | ___ | ___ |
| (Name, Title, Signature) | ___ | ___ | ___ |
| (Name, Title, Signature) | ___ | ___ | ___ |

For comments, please refer to the "Headquarters Post Order Custody Review" form.

(Final 10/18/99)

**113**